620 So.2d 918 (1993)
Charles Edward HORTON, et al., Plaintiffs-Appellees,
v.
Carl C. McCRARY, et al., Defendants-Appellants.
No. 92-1123.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1993.
Rehearing Denied July 30, 1993.
*922 Kenneth D. McCoy, Jr., Dee A.U. Hawthorne, for Charles Edward Horton et al.
John J. Weigel, Deborah A. Van Meter, for Carl McCary et al.
Sidney Albert Cook, for Aetna Cas. & Sur. Co.
Jack O. Brittain, for Ins. Co. of North America.
Joe Payne Williams, for Bluebonnet Administrators.
Gordon E. Rountree, for amicus curiae.
Before DOUCET, KNOLL and COOKS, JJ.
KNOLL, Judge.
This appeal addresses two judgments. The first is a default judgment entered on the issue of liability when certain defendants failed to comply with a discovery order. The second is a judgment in the jury trial which determined the damages plaintiffs suffered.
Charles Edward Horton, his wife, Linda J. Horton, and their son, Timothy S. Horton, sought damages for injuries and losses they sustained on December 22, 1988, when an eighteen wheeler driven by Carl McCrary crossed the highway and crashed head-on into the Horton vehicle on the shoulder of the highway.
On December 19, 1989, the Hortons sued: McCrary; his employer, Allied Systems, Ltd.; Auto Convoy, Ltd., one of Allied Systems general partners; Phoenix Enterprises, the owner of the truck driven by McCrary and the sole limited partner of Allied Systems; Liberty Mutual Insurance Company, the insurer of Allied Systems, Auto Convoy, and Phoenix; Aetna Life & Casualty Insurance Company, the Hortons' personal uninsured motorist insurer; Insurance Company of North America (INA), the company which provided uninsured motorist coverage on the automobile the Hortons were riding; the Succession of Robert Clark, the driver of another vehicle involved in the collisions; and Louisiana Indemnity Company (Louisiana Indemnity), the insurer of Robert Clark.
Louisiana Indemnity was dismissed by summary judgment after it paid its policy limits. INA settled with the Hortons prior to trial and filed an intervention against defendants. Likewise, Bluebonnet Administrators, the Hortons' hospitalization insurer *923 at the time of the accident, filed an intervention against defendants.
On December 19, 1991, the trial court entered a default judgment on liability against McCrary, Auto Convoy, Allied Systems, and Phoenix Enterprises as a sanction when they failed to adequately respond to the Hortons' discovery request. In addition, the trial court ordered defendants to pay attorney's fees of $3,000. No motion for new trial was filed. Writs to the Third Circuit were denied on the entry of the default judgment on the issue of liability. Accordingly, on January 21, 1992, the defaulted defendants filed a motion for a suspensive appeal. In the interim, a writ application filed by the defaulted defendants with the Louisiana Supreme Court was denied.
On January 22, 1992, a week-long jury trial began to determine the amount of damages due the Hortons. The jury awarded damages of $1,965,586.63 to Ed Horton; $538,177.81 to Linda Horton; and $457,420.41 to Tim Horton. During trial, Aetna settled the uninsured motorist claims with the Hortons. The remaining defendants moved for a new trial on damages; after a hearing, the trial court denied the defendants' motion. The defendants then perfected an additional appeal from the jury verdict which awarded damages.
McCrary, Phoenix Enterprises, Auto Convoy, Allied Systems, and Liberty Mutual appeal, contending: (1) the trial court abused its discretion in entering the default judgment on the issue of liability as a sanction for the failure to comply with discovery orders; (2) the trial court erred in failing to grant defendants' motion for a new trial from the jury verdict on the issue of damages, since it was reversible error for the trial court not to apportion fault between the remaining defendants; (3) the trial court made improper evidentiary rulings concerning expert witnesses and the admission of documentary evidence; (4) the jury charges were confusing and misleading to the jury and constitute reversible error; (5) the jury verdict form was improper in that it duplicated items of damages; (6) the jury abused its discretion by granting excessive general damages and loss of consortium awards to the Hortons; (7) the jury abused its discretion in its award for past and future loss earnings and earnings capacity to Charles Horton; and, (8) the jury abused its discretion in awarding Tim Horton for his lost opportunity for a career in professional baseball, since this award was not supported by the evidence. We affirm.

FACTS
This accident occurred on December 22, 1988, as the Horton vehicle traveled south on Louisiana Highway 1 from Shreveport to their home in Natchitoches. Mr. Horton was driving, Mrs. Horton was in the back seat, and Tim, a college freshman who was attending Northwestern State University on a baseball scholarship, was in the front passenger seat. Mr. Horton was 45 years of age and was employed by Sam Friedman as an auditor and supervisor of hotel/motel development nationwide. Mrs. Horton was also 45 years of age at the time of the accident and was employed as a secretary and bookkeeper for the Natchitoches Parish Indigent Defender Board.
Just after passing through Armistead, Louisiana, Mr. Horton slowed down and began to move onto the shoulder of the road because he saw that a serious accident had taken place some distance ahead of them. Just after telling his family that there was an accident ahead, Mr. Horton warned his family that they were about to become involved in a head-on collision. Mrs. Horton testified that after hearing her husband's warning, she leaned forward to look; there she saw a northbound eighteen wheeler cross into the southbound lane and it angled directly toward them, striking them head-on on the shoulder of the road.
The force of the collision pushed the Horton vehicle off the highway and into a water-filled ditch alongside the highway. Mr. and Mrs. Horton were in their vehicle knee-deep in water. Tim was hip-deep in water.
Mr. Horton testified that he roused himself long enough to learn that his son was *924 still alive. Then he lost consciousness. Tim momentarily lost consciousness and then woke up to see his father's face bloodied. Mrs. Horton did not lose consciousness. She said that she could tell that her husband was seriously hurt and thought that he might be dying. Tim's left leg was broken.
Emergency medical personnel removed the Hortons from their automobile. Tim and his father were brought in the same ambulance to Huckaby Clinic. Tim testified that he thought his father was dying because he had difficulty breathing. Mrs. Horton was taken in a separate ambulance to the same clinic.
After stabilizing the Hortons, all three were transported to Schumpert Medical Center in Shreveport. Mr. Horton received a closed head trauma, fractured ribs, a collapsed lung, broken teeth, various lacerations and contusions, and a permanently damaged fourth cranial nerve, resulting in diplopia (double vision). He remained hospitalized for twelve days until January 4, 1989. Mrs. Horton had a laceration of her ear, fractured ribs, and fractures of both collar bones. She was discharged with her husband on January 4, 1989. Tim's broken left leg required surgery. Because of the development of blood clots, Tim remained hospitalized at Schumpert until January 11, 1989. The Hortons' injuries will be detailed later.

SANCTION OF DEFAULT JUDGMENT OF LIABILITY
McCrary, Phoenix Enterprises, Auto Convoy, Allied Systems and Liberty Mutual (hereafter the defendants) contend that the trial court abused its discretion by entering a default judgment against them on the issue of liability as a sanction for failure to comply with discovery.
Factual background. On May 23, 1991, the Hortons submitted interrogatories and requests for production of documents to defendants. Defendants neither filed objections to this discovery nor sought a motion for protective order. In July of 1991, a trial date of January 21, 1992, was fixed.
On October 15, 1991, defense counsel informed plaintiffs' counsel that he was unable to respond fully to the discovery requests because the defendants had not provided him with all of the necessary information. When no further response was had, plaintiffs' counsel filed a motion to compel discovery on October 23, 1991. A hearing on plaintiffs' motion was set for November 13, 1991.
At the November 13 hearing, the record reflects the following colloquy:
"MS. HAWTHORNE: Your Honor, I represent the Hortons and you can see by my motion that we filed discovery somewhere in mid-summer and have gotten absolutely no response, no filed response. Mr. Hunter [counsel for defendants] has given me a couple of things but there's no response filed, and the company is apparently refusing to agree to allow him to release anything to me.
And I want an order to compel them to do so because we set this trial for the end of January with the understanding that everybody was going to cooperate and get this done.
THE COURT: All right. Let's see if I understand. You have asked for the discovery of documents and for answering of ... MS. HAWTHORNE: And interrogatories.
THE COURT: And interrogatories, all right.
MS. HAWTHORNE: There's nothing filed.
THE COURT: Now, Mr. Hunter, what do your people tell you and what is ...
MR. HUNTER: Your Honor, I've prepared interrogatories in response and I've got a client or the trucking company that's located closed [sic] to Atlanta, Georgia, that has to approve them. It's hung up in their approval process and..."
Plaintiffs' counsel then asked the trial court to issue an order compelling defendants to respond fully to the discovery request, and asked that the defendants be specifically warned that failure to comply with discovery could result in sanctions, *925 including the issuance of a default judgment.
The trial court fixed plaintiffs' attorney's fees at $500 and ruled that defendants had ten days to comply with the discovery request. The following conversation between the trial court and defense counsel took place:
THE COURT: ... Then if they [defendants] don't ... [comply with plaintiffs' discovery request within ten days of this order to compel discovery] well then I'm put where about the only thing I can do is render default judgment or strike their defenses.

MR. HUNTER: I understand, Your Honor, and I've told them that. But maybe this will get their attention." (Emphasis added.)
The trial court granted defendants until November 24, 1991, to comply with the Hortons' discovery request. Furthermore, incorporated within the judgment on plaintiffs' motion to compel, the judgment specifically stated:
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that if defendants fail to obey this order, the court will order such penalties as are provided by Louisiana Code of Civil Procedure Article 1471, which penalties include, inter alia, the granting of a judgment by default against the disobedient party."
Notice of the judgment on the motion to compel was served on defendants through their counsel.
On November 22, defense counsel mailed answers to the Hortons' discovery request. However, since plaintiffs' counsel thought that many of the defendants' answers were incomplete, evasive, and non-responsive to their discovery request, they motioned the trial court pursuant to LSA-C.C.P. Arts. 1470 and 1471, to find the defendants in contempt, to enter a default judgment against the defendants, and to assess them with attorney's fees and costs.
The sanctions hearing was held on December 19, 1991. After reviewing the defendants' answers to discovery at the hearing on plaintiffs' motion for sanctions, the trial court held that the information sought by plaintiffs was "very relevant, admissible, heart of the matter testimony and documents." It then found that the defendants hid evidence and "placed the plaintiffs in an untenable and unfair position and as a result there will be judgment, a default judgment entered in favor of the plaintiffs on the issue of liability."
Legal analysis of sanction imposed. At the heart of our analysis is LSA-C.C.P. Art. 1471 and the jurisprudence which has interpreted that article.
LSA-C.C.P. Art. 1471 provides in pertinent part:
"If a party ... fails to obey an order to provide or permit discovery, including an order made under Article 1469 ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
* * * * * *
(3) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party."
The ultimate sanction for a recalcitrant defendant is the issuance of a default judgment. Robinson v. Miller, 423 So.2d 45 (La.App. 1st Cir.1982). The trial court has much discretion in selecting the appropriate sanctions for failure to comply with discovery orders, and a judgment granting a sanction will not be disturbed on appeal absent a clear showing of abuse. Id. When a failure to make discovery occurs, it becomes incumbent upon the disobedient party to show that his failure was justified or that special circumstances would make an award of expenses unjust. Allen v. Smith, 390 So.2d 1300 (La.1980). Finally, dismissal with prejudice is an abuse of discretion where the record does not establish that the failure was due to the willfulness, bad faith or fault of the plaintiff himself as opposed to his counsel. Id.
In the case sub judice, the defendants, relying primarily on Allen, supra, argue *926 that the record does not support the trial court's sanctioning choice because there was no showing of their willfulness, bad faith or fault. Instead, they argue that it was the fault of their attorney. In the alternative, they argue that the record does not support the trial court's determination that their response to discovery was so deficient that the ultimate sanction of a default judgment was necessitated.
From the outset, we find it necessary to comment on two general arguments advanced by the defendants in this appeal. They assert that the trial court should have been required to call in the individual defendants to testify before entering the default judgment. They also assert that they should have been given personal notice of the November 13 judgment which contained the specific warning of the possibility of the default sanction. We disagree.
Neither the procedural articles nor the jurisprudence require the action suggested by the defendants in this appeal. The transcript of these proceedings show that, in accordance with law, notice of the November judgment was personally served on defendants through their attorney of record. Likewise, knowing that the trial court stated in the judgment that it was considering the imposition of a default judgment on defendants' liability, it was incumbent upon the defendants to satisfactorily respond to the Hortons' discovery request or be prepared to present whatever evidence they thought necessary in the December hearing which would have prevented the entry of a default judgment against them.
Our system of representative litigation gives the trial court the right and duty to rely on the representations made by counsel. As pointed out hereinabove, our Code of Civil Procedure does not require the trial court to rule the various defendants into court when it is faced with a decision regarding the imposition of sanctions. To accept the argument made by defendants we would have to disregard counsel's representative role as advocate for his client(s), with his correlative duty as an officer of the court, and create an affirmative duty on the part of the trial court which is not required by law.
Furthermore, we have reviewed the Allen decision relied upon primarily by the defendants, as well as like jurisprudence, and find that it does not mandate a reversal of the trial court's entry of the default judgment. Unlike Allen, we have been presented with a full transcript of both the November and December sanction hearings. It is noteworthy that the November hearing and judgment specify that the defendants' failure to comply with the plaintiffs' discovery request might result in the entry of a default judgment. Thus, defendants cannot assert that the trial court blind sided them with this sanction at the later hearing.
Moreover, we note that the December hearing is spread out over seventy pages, and consists of a very thorough review of the defendants' responses to the interrogatories propounded as well as the motion to produce documents/physical evidence. The record clearly shows that the trial court carefully differentiated between the limited instance of non-compliance that it considered to be attributable to defense counsel and the greater evidence of the defendants' failure to comply. Numerous times reference was made in both hearings by defense counsel that the inability to properly respond was the fault of his clients. At one point, defense counsel stated:
"It has been a flustering experience both for her [counsel for the Hortons], her law firm, and for me and my law firm in obtaining the answers to interrogatories and the requests for production."
Counsel for the plaintiff and the trial court make reference also to the quality of their past dealings with defense counsel and find a basis for support of their belief that the fault for the failure to comply with discovery rested with defendants.
After carefully reviewing the record, we cannot say that the trial court was manifestly erroneous in its conclusion that the defendants' failure to adequately respond to discovery constituted willfulness, bad faith or fault on their part.
*927 Now we turn our attention to defendants' alternative argument that the trial court abused its discretion when it concluded that defendants' response to discovery was so inadequate that it called for the entry of a default judgment on the issue of liability.
When defendants fail to respond to the discovery before the hearing on the motion to compel, they waive their right to make objections to the plaintiffs' inquiries and requests. Theriot v. Willis, 482 So.2d 681 (La.App. 1st Cir.1985). Furthermore, in reviewing an answer to discovery, LSA-C.C.P. Art. 1469 states that an evasive or incomplete answer is to be treated as a failure to answer.
The record shows that the trial court carefully reviewed defendants' responses to discovery. It is clear that the trial court allowed the Hortons to present their objections and gave an opportunity to defendants to answer the individual complaints raised. The trial court determined that the Hortons' requests went to the heart of the litigation, noting that their discovery requests were directly relevant to proof of the defendants' liability. Before making its final assessment of the sanctions motion, the trial court stated for the record that defendants were sophisticated defendants; they had personnel at the scene of the accident almost immediately and began gathering information relative to their assessment of liability as it related to their drivers' actions in causing this accident. After carefully reviewing the discovery request and the answers provided, the trial court concluded that the defendants presented answers which were unbelievable and that they showed a pattern of withholding relevant information.
In our appellate review of this case, we cannot say that the trial court's assessment was flawed by its reference to the sophistication of these defendants and in its conclusion that the defendants failed to provide answers which met the requirements of law. Therefore, after carefully reviewing the record before us, we cannot say that the trial court was clearly wrong in its determination that the entry of a default judgment was justified by the evidence presented.

ISSUES NOT PROPERLY PRESERVED FOR APPELLATE REVIEW
In its appellate brief, the defendants contend that Dr. Kay Knotts was improperly allowed to give expert testimony and that Ken Aaron's expert testimony was cumulative and misleading. We have carefully reviewed the record and find that defendants made no objection at trial to the testimonies of Aarons and Dr. Knotts. Accordingly, we find that defendants failed to preserve these issues for appellate review.
Defendants likewise raised in their motion for new trial and again on appeal that the trial court should have allowed the jury to apportion fault in the trial for damages. In this regard, we note again that defendants made no effort in the trial court to raise this objection prior to the submission of the case to the jury. No evidence was offered or proffered by defendants on this issue; no request was made to charge the jury on the apportionment of fault and no objection was made to the absence of such a question in the jury interrogatories. Accordingly, we find that defendants failed to preserve this issue for appellate review.

EVIDENTIARY ISSUES
The defendants contend that the trial court erroneously admitted into evidence Tim Horton's scrapbook which contained newspaper articles about his athletic achievements. They also complain that the photographs of the eighteen wheeler and the Hortons' automobile were inflammatory, prejudicial, and cumulative and should not have been admitted into evidence.
When the Hortons offered Tim's scrapbook into evidence, the defendants objected on the grounds that the newspaper articles contained therein were inadmissible hearsay. The scrapbook contained newspaper clippings, pictures of Tim, and awards Tim received during high school and college.
Under Article 801 of the Louisiana Code of Evidence, hearsay is defined as "a statement, *928 other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted."
In argument to the trial court, the Hortons stated that their purpose in offering the scrapbook into evidence was not to establish the truth of the newspaper articles. Rather, the scrapbook was entered into evidence to show Tim's desire and fervor for athletics, and to help quantify the loss Tim suffered because of his inability to continue participation in athletics at the same level he experienced prior to the accident.
After carefully reviewing the record and the reasons assigned by the trial court, we find no error in its evidentiary ruling. Tim's mother identified the scrapbook when it was entered into evidence, and thereafter elaborated at length on Tim's participation in athletics and his successes, particularly in baseball.
The defendants also argue on appeal that the trial court erred in its admission into evidence of various photographs of the accident scene which depict the final resting position of the eighteen wheeler against the Horton automobile and later at the garage where they were stored.
The defendants objected to the photographs in a pre-trial conference on the date of trial. At that time the defendants argued that the photographs were highly prejudicial under LSA-C.E. Art. 403 and that the Hortons proposed to introduce a disproportionate number of photographs. The trial court ruled that the photographs were admissible relevant testimony to show the severity of the impact and to further substantiate the severity of the injuries which the Hortons received. When the photographs were introduced into the record during the testimony of Mrs. Horton, the defendants did not re-urge their objection.
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. LSA-C.E. Art. 403. A trial judge is granted a great deal of discretion in assessing the probative value of evidence. Hebert v. Angelle, 600 So.2d 832 (La.App. 3rd Cir.1992), writ denied, 604 So.2d 997 (La.1992).
On appeal, the defendants contend that the photographs were prejudicial and cumulative, and should have been excluded by the trial court.
From the outset we note that the cumulative nature of the evidence is not considered a factor under Art. 403. Accordingly, we are relegated to consider whether the introduction of this evidence was prejudicial to the point that these photographs would have aroused the sympathy of the jury in favor of the Hortons.
After carefully reviewing the photographs in light of defendants' argument, we cannot say that the trial court abused its discretion in allowing the photographs into evidence.

EXPERT TESTIMONY OF BRIAN MEAUX
The defendants contend that the trial court was manifestly erroneous when it allowed Brian Meaux to testify as an expert in the area of physical education with emphasis in assessing skills to play baseball.
We note that when the defendants objected at trial they limited their objection to the ground that Meaux lacked "the requisite experience as required to inform the court of the facts." Defendants now argue that Meaux's testimony was prejudicial, misleading, confusing, and cumulative. It is well established that an appellate court may only address the objections actually raised in the trial court. Accordingly, we will only address the specific objection raised by defendants in the trial court.
The rulings of the trial court on qualifications of expert witnesses will not be disturbed in the absence of manifest error. State v. Ourso, 438 So.2d 1239 (La. App. 3rd Cir.1983), writ denied, 442 So.2d 460 (La.1983). The criterion for the reception of expert testimony is whether a witness's *929 specialized knowledge, skill, experience, training, or education would "assist the trier of fact to understand the evidence or to determine a fact in issue." LSA-C.E. Art. 702.
The ultimate conclusion which the defendants attack is Meaux's expert opinion that Tim Horton would have been drafted for professional baseball. They contend that Meaux did not have the requisite qualifications to render this opinion.
In ruling on the defendants' objection to Meaux's qualifications to render an expert opinion, the trial court stated:
"Now, if he doesn't have the experience if we had one of the Dodger scouts in here who had his education and in all those years of scouting, but I ... am going to rule for the record that your objection goes to the weight of his testimony rather than to the admissibility of it.
* * * * * *
[S]ince he doesn't have the experience that a scout for the Dodgers would have, the jury may not attach as much weight to his testimony as they might to someone else ... So, he's going to be accepted as an expert in assessing the baseball skills generally, and of Mr. [Tim] Horton specifically if he has observed him enough to do so. And, of course, that's for the jury to decide."
Meaux had a degree in physical education with an emphasis on coaching. He testified that his educational background provided him with information concerning the limitations of athletes, recruiting, and what to observe in young athletes. He had much experience in working with young athletes on the field, and he received professional training from professional and former professional ballplayers and coaches. He coached baseball, taught baseball techniques, and played semi-pro baseball.
In addition, Meaux was a fact witness who had personally observed Tim Horton during his last two years of high school athletics, as well as when Tim played baseball while attending Northwestern State University. Moreover, he observed the abilities of other college baseball athletes who later became professional baseball players.
Based on this broad spectrum of information, Meaux opined that Tim Horton had better skills than many of the other college baseball players who became professionals. Accordingly, he concluded that "if Tim had continued on the pace that he was going through his freshman year there was no doubt in ... [Meaux's] mind that Tim would have been picked up by a professional ball club."
After carefully reviewing the record, particularly in light of the trial court's ruling before the jury when it accepted Meaux as an expert, we cannot say that the trial court was manifestly erroneous in its determination that Meaux was qualified to render an expert opinion in the area that he was tendered.

GENERAL DAMAGES AND LOSS OF CONSORTIUM
The defendants contend that the jury's awards for general damages and loss of consortium were excessive and should be reduced.
It is well established that the initial inquiry in determining whether an award of damages is inadequate or excessive must always be directed to whether the trial court's award of particular injuries and their effects upon the particular injured person was a clear abuse of the trier of fact's much discretion in an award of damages. It is only after an articulated analysis of the facts discloses an abuse of discretion that an award may on appellate review, for articulated reasons, be considered either excessive or insufficient. Only after such a determination of abuse has been reached is a resort to prior awards appropriate for purposes of then determining what would be an appropriate award. Absent an initial determination that a trial court's very great discretion in an award of general damages has been abused under the facts of a particular case, the reviewing court should not disturb the trier's award. Reck v. Stevens, 373 So.2d 498 (La.1979).
*930 Tim Horton's injuries. The jury made the following general damages awards to Tim: past physical pain and suffering, $100,000; past mental and emotional pain and suffering, including mental anguish and emotional distress, $100,000; future mental and emotional pain and suffering, including mental anguish and emotional distress, $50,000; past loss of enjoyment of life, $50,000; and lost opportunity for career in professional baseball, $100,000. For reasons which follow, we do not find that the jury abused its discretion in making these awards.
Tim was nineteen years of age at the time of the accident and was enrolled at Northwestern State University. At the time of the accident, Tim was seated in the front passenger side of the vehicle. He sustained an oblique fracture of the left femur near the knee with bleeding inside the bone. His left knee was markedly swollen and there was a hematoma at the fracture site. In addition, he had a laceration on his forehead and another on his leg which required suturing, as well as abrasions and multiple contusions over his left knee. Dr. William Fox, an orthopedist, performed surgery to fix Tim's left femur. A metal rod was inserted into Tim's thigh bone which extended from the bone into the hip. After surgery, Tim's leg was placed in a box-shaped device which kept the leg moving.
During Tim's hospitalization he developed blood clots in his lungs which caused him severe pain. To verify the existence of the blood clots and to determine the course of medical treatment, Tim underwent a pulmonary arteriogram. Once the blood clots were identified, Tim began anticoagulant therapy. He received Heparin and later Coumadin to thin his blood. Because of the danger of bleeding caused by the therapy, Tim's blood was drawn daily for testing while he remained in the hospital; after returning home, his blood was tested once or twice a week, and he was instructed on the signs of bleeding which may occur as a result of the blood thinner. Tim remained on Coumadin therapy until April of 1989.
While hospitalized, Tim developed atelectasis in the right lung and severe anemia. His blood count dropped significantly from 15 grams to 8.9 grams. Because of the Coumadin therapy Tim suffered severe nausea which markedly affected his appetite. As a result, he lost thirty pounds in twenty days.
Tim needed assistance at home when he returned from the hospital because of his crutches. Home Health Services treated him regularly until March 17, 1989, and then he began outpatient physical therapy and an outside lab did his required blood work.
Tim testified about the pain caused by the metal pin inserted in his leg. The pin was not surgically removed until July 12, 1989. Dr. Fox testified that Tim developed osteoporosis of bone below the fracture, and that the muscle fibers in Tim's thigh have been damaged and permanently scarred. Because of this later effect on Tim's muscles, Dr. Fox assessed Tim with a 5% disability.
The record bears out the mental pain and anguish Tim suffered. Tim testified that when he awakened in the automobile, he was frightened because he was waist-deep in water, in terrible pain, and unable to move. He likewise testified about seeing his father's blood-covered face, and hearing him gasp for breath. He described the helplessness he encountered, feeling that his father was going to die and that he could not assist him. He further described the anxiety he experienced when the emergency medical personnel were unable to first attend to his father because they could not reach him since the eighteen wheeler crashed into the driver's side of the Horton vehicle and was wedged against the door.
In a particularly emotional scene, the jury heard how Tim's father was a different person after the accident. Tim described quite vividly how his father who had been loving and kind prior to the accident, violently pinned him against the wall shortly after Tim returned home because Tim had remarked that his father was repeating himself. As a result of his father's *931 violent temper, Tim was forced to leave home.
Furthermore, much of the trial testimony regarding Tim's injuries revolved around his athletic achievements and ambitions, and how his injuries affected those. Tim testified that when he was in the ambulance he saw his knee moving freely and that all he could think about was how he would never again be able to play baseball. He likewise conveyed the fear he felt when the doctors told him that the pulmonary arteriogram to test for his blood clots might even kill him.
Despite Tim's attempts to regain his preaccident physical condition, the record preponderates that he would not be able to pursue his dream of playing professional baseball. The testimony of the two expert witnesses, Meaux and Coach Johnny Emmons, clearly show that Tim had the desire and the ability before the accident to play professional baseball.
Considering the entirety of the evidence adduced at trial, we cannot say that the jury abused its discretion in assessing the general damages due Tim Horton.
Linda Horton's injuries. The jury made the following general damage awards to Linda Horton: past physical pain and suffering, $50,000; future pain and suffering, $10,000; past mental and emotional pain and suffering, including mental anguish and emotional distress, $250,000; future mental and emotional pain and suffering, including mental anguish and emotional distress, $100,000; past enjoyment of life, $50,000; future loss of enjoyment of life, $25,000.
Mrs. Horton received multiple injuries as a result of the collision. Dr. Wallace H. Brown, a plastic surgeon, described how Mrs. Horton's left ear was cut through and through and had to be replaced in its anatomical position with sutures. Dr. Fox's orthopedic records show that both of Mrs. Horton's collar bones were broken, one badly displaced. In addition, she had five rib fractures, two of which were classified as severe. She had renal and pulmonary contusions, bruising over the front of her chest, left breast, the front part of the legs below the knees, and the tops of her hands, a hematoma over both clavicles, swelling of the left elbow and arm, and bleeding around the top parts of her lungs. She also developed a knot over the healing ribs on the right side, osteoarthritic signs, cervical spine irritation as a residual of the sprain, muscle spasms in the shoulders, her upper neck and upper back, a clicking below the clavicle; and a non-union dislocation of a rib where a piece of rib chipped off, forming oscal bone.
Six months after the collision, Mrs. Horton had muscle spasms in the neck and approximately fifty percent limitation in the rotation of the neck. After the collision, Mrs. Horton received physical therapy for approximately fifteen months. At trial, Mrs. Horton testified that she still had pain in her shoulder, neck, and back. She testified that she uses a home traction device on an as needed basis, and that this treatment eased the pain, but that the pain returns. Dr. Fox opined that Mrs. Horton would probably have to use the traction device for the remainder of her life.
Mrs. Horton graphically described the horror she experienced when she realized that a large eighteen wheeler was about to hit their vehicle head on, and how she thought that she and her family were going to die. Likewise, Mrs. Horton explained the helplessness she felt after the accident when she saw her husband and son seriously hurt and she was unable to help them because of her own injuries.
In a similar vein, Mrs. Horton's testimony shows the anguish she suffered as a result of her husband's total change of character following the accident and the turmoil that has engulfed the family since. Her anguish after the accident is best described in her testimony of how she was forced to pull her husband's hurt ear in order to stop him from attacking their son, and then demand that her husband leave home in order to preserve, as best she could, her family. In addition, she explained to the jury how her husband is no longer able to support the family as he did prior to the accident, and his inability to do things around the house any more. As a *932 result, she described the psychological counseling she and her husband have had and will have in the future as a result of the impact of this accident on their family. She likewise explained the mental suffering she endured when she realized the impact that Tim's injury would have on his athletic ambitions.
Based on the record before us, looking at the wide range of injuries Mrs. Horton suffered, we cannot say that the jury's general damage award to Mrs. Horton is excessive.
Mr. Horton's general damage award. The jury made the following general damage award to Mr. Horton: past physical pain and suffering, $100,000; future physical pain and suffering, $50,000; past mental and emotional pain and suffering, including mental anguish and emotional distress, $250,000; future mental and emotional pain and suffering, including mental anguish and emotional distress, $100,000; past loss of enjoyment of life, $50,000; future loss of enjoyment of life, $100,000; permanent physical disability, $100,000.
Mr. Horton was seated in the driver's seat of the Horton vehicle, the position which took the brunt of the eighteen wheeler. The collision knocked Mr. Horton unconscious, and he had difficulty breathing immediately afterwards. Dr. Victor Hernandez, the thoracic surgeon who first rendered treatment in Schumpert's emergency room, stated that Mr. Horton had seven comminuted fractured ribs, and he suffered blunt trauma, multiple contusions and abrasions to the chest, as well as a contusion and laceration of the left lung which caused a partial lung collapse and subcutaneous emphysema. Additionally, Mr. Horton had complex and simple lacerations to both ears, a 3 to 4 centimeter abrasion on the forehead, a muscular ligamentous strain of the cervical spine, and contusions of the nose, both hips, knees, arms and right ankle. Seven of Mr. Horton's teeth were broken, requiring a crown replacement of one, a restoration of another, and five root canals with crowns. Mr. Horton also suffered a serious contusion of the left temporoparietal region of the brain which caused swelling of the brain. A concomitant component of Mr. Horton's brain injury was a permanent paralysis of the fourth cranial nerve, resulting in double vision.
When Mr. Horton was hospitalized in intensive care at Schumpert Memorial, a chest tube was placed for several days. Because Mr. Horton continuously jerked off the oxygen mask, his wrists were placed in soft restraints. After remaining four days in ICU, Mr. Horton was transferred to a private room where he remained until his discharge.
Because of the blunt trauma to the brain, Mr. Horton was disoriented and confused after the accident. As a result of the head trauma, Mr. Horton suffered loss of memory, problems with concentration, difficulty sustaining attention, loss of creativity, and loss of flexibility. After the accident, Mr. Horton was very repetitive. At the time of trial, he was still unable to perform simultaneous processing of information. Accordingly, he has resorted to making lists so that tasks can be done sequentially or at least presented in order. He now deals with information only on a very superficial, simple level.
Dr. Paul Ware, the neuropsychiatrist who was still treating Mr. Horton at the time of trial, diagnosed the injury as residual brain damage that has caused Mr. Horton's thinking process to slow down, has detrimentally affected his processing abilities, has impaired his memory, and has caused emotional problems. Dr. Ware opined that Mr. Horton's brain damage is permanent.
The record shows that as a result of the brain injury, Mr. Horton has difficulty interacting with other people, including his immediate family, and he is unable to successfully perform the work he did before the accident.
As alluded to in prior discussions, Mr. Horton's brain injury caused disharmony in the family when they returned home from the hospital. Although Mr. Horton had a close family relationship before the accident, the record shows that when he returned from the hospital, he was violent *933 and aggressive. The record shows that Mr. Horton was forced to leave home for a short period of time after he attacked his son, Tim, shortly after they returned from the hospital, because Tim commented on his father's repetitiveness. Depression and talk of suicide has become a part of Mr. Horton's life, and has necessitated psychological counseling. The medical testimony is unrefuted that continued counseling will be required.
The record shows that Mr. Horton was a very creative and successful businessman prior to the accident. Because of his brain damage and his double vision, he admitted that he could not return to his former employment because he is not as clever and smart as he once was. He poignantly described how he has realized that his problems are not solely attributable to his double vision, but are in part also the result of his lowered mental ability. Furthermore, Mr. Horton described all the things he can no longer do, i.e., drive an automobile, fish successfully, perform complicated carpentry tasks, stage social gatherings, and the like.
His former employer, Sam Friedman, testified about Mr. Horton's creativity and resourcefulness during his employment. Mr. Friedman further testified that after being with Mr. Horton on various occasions since the accident, Mr. Horton is not as smart as he was prior to the accident and he could not perform the same work tasks he once did.
Cecil Knotts, a close friend of the Hortons, described his association with Mr. Horton prior to the accident and compared it to their present relationship. Mr. Knotts' testimony is corroborative of Mr. Friedman's and bears out that Mr. Horton has suffered severe mental deficits as a result of the accident.
The primary thrust of the defendants' objection to Mr. Horton's general damage award is their contention that he failed to submit to surgery for his double vision. They argue that this is the largest component which contributes to his depression and his inability to perform as he once did.
Louisiana jurisprudence states that a plaintiff is under a duty to minimize his damages by submitting to reasonable corrective surgery necessary to eliminate any permanent disability. Pisciotta v. Allstate Ins. Co., 385 So.2d 1176 (La.1979). However, Louisiana law is clear that the burden is on the defendant to show to what extent damages should be mitigated and that the rule of mitigation of damages should be applied with extreme caution. Reeves v. Travelers Insurance Company, 329 So.2d 876 (La.App. 2nd Cir.1976). For reasons which follow, we find no error if the jury chose not to impose the rule of mitigation of damages on Mr. Horton.
Without surgery, Mr. Horton tilts his head and depresses his chin so that he can look through a corner of his eye without seeing double images. Dr. Robert Gordon, an opthamologist, proposed surgery which would eliminate Mr. Horton's need to tilt his head; in essence, the surgery would move Mr. Horton's window of clear vision so that it would be in front of him rather than to the side. Although Dr. Gordon testified to a high rate of success for this surgery, Dr. Reginald Wheat, Mr. Horton's treating opthamologist, was not as optimistic. Moreover, Mr. Horton testified of his extreme fear of this surgery, particularly since the surgery might adversely affect both of his eyes.
Furthermore, even in light of Mr. Horton's eye problems, the record preponderates that even with eye surgery, Mr. Horton would nevertheless be unable to do many things he did prior to the accident because of the greater debilitating effect of Mr. Horton's mental problems.
In light of the record testimony of Mr. Horton's higher intellect prior to the onset of the injuries in this accident, his double vision problems which restrict his activities, his hampered mental functioning to the extent of his inability to perform complex, creative thinking, and the severe emotional problems he continues to face, we cannot say that the jury's award of general damage was excessive to the point that it shocks our consciences.
*934 The Hortons' loss of consortium awards. The defendants contend that the jury's awards of $25,000 each to the Hortons for loss of consortium is an abuse of discretion.
An award for the loss of consortium for a spouse's injuries includes the loss of love and affection, society and companionship, sexual relations, right of performance of material services, right of support, aid and assistance, comfort and solace, and felicity. Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La.App. 3rd Cir.1990), writ denied, 565 So.2d 450 (La.1990). A parent may recover under loss of consortium for the loss of aid, assistance, companionship, affection, society, and service attributable to the injury of a child. Lee v. USAA Cas. Ins. Co., 540 So.2d 1083 (La.App. 1st Cir.1989), writ denied, 542 So.2d 514, 515 (La.1989). With the exception of the sexual component, a child may be awarded for loss of consortium attributable to an injury to a parent to the same extent as a spouse. Higley v. Kramer, 581 So.2d 273 (La.App. 1st Cir. 1991), writ denied, 583 So.2d 483 (La.1991).
In the case sub judice, the record is replete with evidence of how this accident adversely affected this close knit family. On the most basic level, because of the injuries each member of the family received, none was able to help the other during the immediate recuperative period. Moreover, a loving father-son relationship was replaced with violence and anger, and a loving husband-wife relationship with psychological counseling and physical separation. Accordingly, we find no abuse of discretion in the jury's assessment of awards to each family member for their individual loss of consortium.

MR. HORTON'S AWARD FOR LOSS OF EARNINGS
The defendants contend that the jury's award to Mr. Horton for loss of earnings, past and future, as well as loss of earning capacity was excessive and not supported by the evidence.
The law relative to this issue was well established in Folse v. Fakouri, 371 So.2d 1120 (La.1979), and remains unchanged today. See, Hobgood v. Aucoin, 574 So.2d 344 (La.1990). In Folse at pp. 1123, 1124, the Louisiana Supreme Court stated:
"What plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power. And while his earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury.
* * * * * *
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily." (Citations omitted.)
The defendants argue that the evidence does not support the following facts relied upon by the jury in its assessment of Mr. Horton's economic losses: (1) that Mr. Horton would have earned a salary of $74,000 per year; (2) that he was unable to return to work in March of 1990; (3) that his employer at the time of the accident would have paid him a $7,000 bonus for 1988; (4) that a yearly offset of $15,000 rather than $18,000 was appropriate; and, (5) that he was entitled to compensation for his loss of accumulated frequent flier mileage. Since all of these objections relate to factual determinations made by the jury, we will briefly review the evidence relative to economic loss.
The sole expert witness on the calculation of Mr. Horton's economic losses was Dr. Melvin Harju, a professor of economics. At the time of the accident Mr. *935 Horton was employed by Mr. Sam Friedman as an internal auditor and supervisor of hotel/motel development. Mr. Friedman testified that Mr. Horton's salary would have risen to $50,000 in March 1989 because Mr. Horton's job responsibilities would have increased as the result of the formation of a new company, Dimension Development. Mr. Friedman hired John Davies in December 1989 to fill Mr. Horton's position at a starting yearly salary of $68,000. In September 1990, Mr. Friedman raised Davies's salary to $74,000 per year. At trial, Mr. Friedman testified that had Mr. Horton been employed with him at that time, he would have received a salary of approximately $75,000 per year.
Regarding Mr. Horton's ability to return to work, Mr. Horton presented the testimony of Dr. Richard Galloway, a certified rehabilitation counselor. After reviewing the tests and relevant information regarding Mr. Horton's ability to return to work, Dr. Galloway stated:
"I think the kind of problems that he's having right now would only aggravate his inability to sustain employment at this point and time. There may be jobs like that existing, yes, but I think that he would have difficulty holding them at this point and time."
Our review of the record does not reveal any evidence which established that Mr. Horton was able to return to work in March 1990.
We now turn to defendants' contention that the jury should have considered that Mr. Horton was able to earn $18,000 annually from March 1990 and should have credited its award accordingly. As pointed out above, the jury could have relied upon Dr. Galloway's testimony that even at the time of trial Mr. Horton was unable to return to work. Nevertheless, we point out that under cross-examination, Dr. Harju provided testimony concerning Mr. Horton's loss based on an annual salary of $18,000 from the date of trial. Accordingly, the jury did have information to assess any credits to future loss of income based on the $18,000, at least from the date of trial forward.
With regard to defendants' contention that Dr. Harju did not take into account the fringe benefits of health and disability insurance in offsetting Mr. Horton's future losses, we simply state that the defendants did not present any testimony which would have quantified these amounts. Unlike the suggestion of defendants, these fringe benefits are not common knowledge and, without proof, it would have been inappropriate for Dr. Harju or the jury to take these into consideration.
Next, defendants contest Dr. Harju's inclusion of a $7,000 bonus in his calculation of past loss of wages for 1988. The company's bonus plan mandated that eligibility for the bonus was premised on an employee's continued employment with the company in the following March. Since Mr. Horton was not employed in March of the year following his accident, the defendants contend that Mr. Horton failed to qualify. We disagree. Mr. Friedman testified that he considered that Mr. Horton qualified for the bonus because "but for" the December accident, he would still have been employed.
The final factual issue raised by defendants is that the jury improperly compensated Mr. Horton for his loss of past and future fringe benefits for frequent flier miles based on $140 per month. Defendants' contention is that there was no evidence that Mr. Horton would have used this benefit. We find defendants' argument misplaced. As pointed out in Folse, the focus of attention is on whether the injured party was deprived of earning potential "despite the fact that he may never have seen fit to take advantage of the capacity." Accordingly, the jury properly considered these frequent flier miles in its calculation of damages suffered.

JURY INSTRUCTIONS AND JURY INTERROGATORY FORM
Defendants contend that the trial court gave improper and confusing jury instructions relative to LeJuene damages, gratuitous sitting services, and the loss of enjoyment of life.
*936 Unless a party objects to a jury instruction before the jury retires or immediately thereafter, that party may not assign as error the giving of that instruction. LSA-C.C.P. Art. 1793.
In the present case, our careful review of the record reveals that the defendants did not object to the trial court's instruction on LeJeune type damages. Accordingly, this assignment is not properly before us for appellate review.
Likewise, with regard to defendants' objections to the jury interrogatory form, we note that the record reflects that defendants made no objection to the proposed form which was submitted to the jury. A party waives its objection to the jury interrogatory form if it objects after the jury has retired for deliberation. Streeter v. Sears, Roebuck and Co., Inc., 533 So.2d 54 (La.App. 3rd Cir.1988), writ denied, 536 So.2d 1255 (La.1989). In the present case, defendants' first objection to the interrogatory form appears in their appellate brief. Accordingly, we find that the defendants waived any objection they may have had to the jury interrogatory form.
With regard to the jury instructions on gratuitous sitting services and loss of enjoyment of life, the only contemporaneous objection raised by defendants was on the ground that the instructions were incomplete.
In its jury instructions the trial court simply stated to the jury that the Hortons were entitled to recover a reasonable amount for gratuitous nursing and home care services if the services are shown to have been necessary. Even taking into consideration the factors enunciated in Bordelon v. Aetna Cas. & Sur. Co., 494 So.2d 1283 (La.App. 2nd Cir.1986), we find that the jury charge given by the trial court adequately instructed the jury. The instruction particularly referred to the necessity for such services and the reasonableness of the amount awarded.
Furthermore, the record before us shows that although the Hortons sought recompense for only one person's services, in fact four or five persons rendered gratuitous service to the Hortons in the hospital and at home until March 7, 1989. Moreover, even though gratuitous care was rendered for 75 days, the Hortons sought recovery for only 56 days of services. Simply because all of the Horton household was seriously injured, the need for services was readily apparent and well documented in the record. Based on this information, we find that the jury properly concluded that there was a need for services to the Hortons. Furthermore, Dr. Harju's projections of $5.00 per hour is reasonable and less than the amount recognized in other reported cases. Accordingly, we find no error in the trial court's instructions and no error in the jury's award of $6,720 for these services.
We likewise find no merit to defendants contention that this award should not be made because a majority of the services were rendered by Mrs. Horton's parents. The case of Allen v. Ball, 417 So.2d 1373 (La.App. 4th Cir.1982), relied upon by the defendants, does not stand for this proposition, and our research has failed to find jurisprudence which would support their position.
In the next instance, the defendants complain that the trial court failed to instruct the jury on the item of damages for loss of enjoyment of life. We disagree. The trial court specifically instructed the jury that the plaintiffs were entitled to recover general damages "if he proves that his lifestyle was detrimentally altered or if he was forced to give up activities because of his injury. Loss of social and recreational activities may properly be considered as one of the components of an award of general damages."
Based on the jurisprudence developed in Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974), Landon v. Hartford Acc. & Indem. Co., 339 So.2d 1307 (La.App. 1st Cir.1976), and Andrews v. Mosley Well Service, 514 So.2d 491 (La. App. 3rd Cir.1987), writ denied, 515 So.2d 807 (La.1987), we find no error in the trial court's instruction to the jury on this item of damages.
*937 For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to McCrary, Phoenix Enterprises, Auto Convoy, Allied Systems, and Liberty Mutual.
AFFIRMED.