666 So.2d 702 (1995)
Barbara BERNARD
v.
Steve LOTT and State Farm Automobile Insurance Company.
No. 95-CA-0167.
Court of Appeal of Louisiana, Fourth Circuit.
December 28, 1995.
Writ Denied March 22, 1996.
*703 Thomas B. Calvert, Metairie, for Plaintiff/Appellant.
John E. McAuliffe, Jr., Bienvenu, Foster, Ryan & O'Bannon, New Orleans, for Defendant/Appellant.
Before BARRY, JONES and LANDRIEU, JJ.
JONES, Judge.
Both parties appeal the trial court's judgment in the damage portion of this bifurcated personal injury cause of action. Defendant, Boh Bros. Construction Company, Inc. appeals the trial court's finding that plaintiff's damages were caused by the accident of December 1987. Plaintiff, Barbara Bernard, appeals the trial court's finding that she suffered no organic brain injury in the accident of December 1987 and the amount of damages awarded for her injuries. We affirm in part and reverse in part.
The facts are taken from the opinion of this Court in the liability portion of the case which has already been appealed.
On December 9, 1987, at approximately 11:00 p.m., plaintiff Barbara Bernard was seriously injured in an automobile accident when a car being driven by Steven Lott swerved into Ms. Bernard's lane and collided head-on with her vehicle. Mr. Lott swerved his vehicle to avoid hitting an unbarricaded, unmarked mound of dirt which was protruding into the roadway. The dirt was left in the road by Boh Bros., which earlier that day had been performing contract work replacing a sewer line for the Sewerage & Water Board of New Orleans.
Plaintiff filed suit against Steven Lott, his insurer, Boh Bros. and the Sewerage & Water Board. Plaintiff settled with Lott and his insurer prior to trial. The trial was bifurcated, and the issue of liability alone was tried before the district court judge on March 16, 1993. On November 15, 1993, the district court rendered judgment finding the plaintiff to be free from fault, Boh Bros, to be seventy-five percent (75%) liable, and Steven Lott to be twenty-five (25%) liable.
Bernard v. Lott, unpub. 94-0567 (La.App. 4th Cir. 12/15/94), 646 So.2d 535, writ denied 95-0134 (La. 3/10/95), 650 So.2d 1187. On appeal this Court affirmed the trial court's judgment and the Supreme Court denied writs.
The damage portion of the trial ensued with extensive medical expert testimony (two ophthalmologists, three neurologists, three *704 orthopedists, one specialist in physical medicine and rehabilitation, three psychiatrists and one neuropsychologist), vocational rehabilitation experts, accountants, plaintiff's father, plaintiff's former employer and plaintiff herself. The trial court issued judgment with the following pertinent reasons:
The court finds that plaintiff did not hit her head in the December 1987 accident and hence, according to the weight of the medical testimony, she did not suffer brain damage as a result of the accident.
However, the court finds that the plaintiff's pre-existing borderline personality disorder was aggravated by the December 1987 accident and that said accident was the catalyst that triggered the psychiatric condition which followed the accident. Further, the court finds that the July 1988 accident did not contribute to or aggravate the personality disorder which had been set in motion by the December 1987 accident.

Damages were awarded as follows:
Past, present and future physical
and mental pain and suffering $200,000.00
Past, present and future medical
expenses $ 55,995.37
Past, present and future loss of
wages and earnings capacity $150,000.00
 ___________
 $405,995.37

Co-defendant, Steven Lott, settled with plaintiff before trial thus Boh Bros.' liability amounted to $304,496.53.
The trial court found that plaintiff suffered from the aggravation of a preexisting borderline personality disorder and not brain damage resulting from her December, 1987 accident. Both parties contest this finding.
It is Boh Bros.' position that plaintiff's condition is unrelated to the December, 1987 accident because the testimony indicated that plaintiff had a preexisting borderline personality disorder and was involved in a subsequent accident. Plaintiff's condition worsened over time. Therefore, Boh Bros. submits it is more likely that an aggravation of plaintiff's preexisting borderline personality disorder resulted from the subsequent accident. The only evidence Boh Bros. offered in support of its position was the testimony of two independent medical examiners, Dr. Levy, a neurologist and Dr. Culver, a psychiatrist. It was the opinion of both independent medical examiners that plaintiff did not sustain a brain injury.
Dr. Levy opined that plaintiff sustained no organic brain injury because the medicals and imaging studies did not support such a finding. Dr. Levy dismissed the possibility of a brain injury because he found it uncharacteristic that plaintiff was able to leave the scene of the accident to report it to the police where she should have been confused or irrational. It was his opinion that plaintiff's problems were psychological or psychiatric in nature. His testimony was directly contradicted by Dr. Ferris who testified that immediately following a brain injury a person could be functional but later when the stretched or ruptured tissues begin to swell symptoms of the brain injury become manifest.
Dr. Culver was the expert that opined that plaintiff had a borderline personality disorder and that all of her problems were psychosomatic. Because he was the only witness to so testify it is on the basis of his opinion that the trial court made its finding. Furthermore, he specifically testified that all of plaintiff's psychosomatic symptoms were occasioned by the December, 1987 accident. He dismissed the possibility of brain damage because he said plaintiff would have to lose consciousness for at least thirty minutes to sustain permanent brain damage. Again this was contradicted by plaintiff's experts, namely Doctors Jamison and Rosenbloom, who testified that brain injury could be the result of closed head injuries that resulted in brief loss of consciousness or no loss of consciousness.
Dr. Roberta Bell, a psychologist with a subspecialty in neuropsychology, was limited by the trial court to the extent that she was allowed to testify regarding the existence of a brain injury because she is not a medical doctor. She did testify that it was possible for a patient to demonstrate neuropsychological deficits with negative CAT scans, EMGs, MRIs, and ENGs as plaintiff did. She explained *705 that this occurs when the brain injury is caused by nerve shearing which does not show up photographically but does show up behaviorally. Contradicting Dr. Culver, she further testified that loss of consciousness results from an injury to the brain stem but plaintiff may have injured some other part of the brain.
Dr. Jamison related Dr. Bell's testimony to plaintiff's case. Dr. Jamison conceded that it was the neuropsychological testing by Dr. Bell that allowed her to piece together her diagnosis. Initially she had assumed because of plaintiff's symptoms and the absence of physical evidence of a brain injury that plaintiff was suffering from post-stress syndrome. When plaintiff's symptoms were viewed together with the test results, including plaintiff's drop in IQ from 113 to 83, she concluded that plaintiff had suffered a brain injury. It was her opinion that plaintiff sustained a whiplash type injury, where the head snapped forward and backward, responding to acceleration/deceleration, resulting in a shearing injury to the brain. Because the injury was diffusedspread over the whole brainit never appeared on the CAT scan, EEG or ENG that she ordered. She causally connected plaintiff's brain injury with the December 9, 1987 accident, as opposed to the July 1988 accident in which plaintiff was also injured, because plaintiff's symptoms dated back to the first accident and it was the more severe of the two.
Dr. Rosenbloom, a specialist in physical medicine and rehabilitation, testified that there are two types of brain injury: with loss of consciousness and without. He testified that brain injuries without loss of consciousness can result in problems of reasoning and thinking. He further testified that such brain injuries are often misdiagnosed and this is because brain injury victims tend to be poor historians. He corroborated the testimony of Dr. Bell and Dr. Jamison that neuropsychological evaluations were useful in identifying brain injuries and discovering malingerers. All agreed that the neuropsychological evaluation of plaintiff had been instrumental in their diagnosis of her brain injury.
The trial court's finding that the weight of the testimony supports a conclusion that plaintiff did not suffer a head injury is manifestly erroneous not only in terms of quantity of testimony but in terms of quality of testimony. Dr. Jamison, plaintiff's neurologist, as well as Dr. Ferris, another neurologist, and Dr. Rosenbloom, a specialist in physical and rehabilitation medicine, agreed it was more probable than not plaintiff suffered a brain injury. Several other physicians testified, including ophthalmologists treating plaintiff for esophoria and orthopedic surgeons treating plaintiff for neck, back and knee injuries who were not called upon to express an opinion regarding the brain injury. Nevertheless the presence of the eye disorder and headaches previously ascribed to the neck, back and knee injuries lends themselves to the existence of a brain injury. Additionally, the opinions of the independent medical examiners are clearly inadequate to explain the breadth and severity of impact that plaintiff's injuries had on her life.
Greater weight should have been given to plaintiff's treating physicians which include Doctors Jamison and Rosenbloom. Pereira v. La. Coca Cola Bottling Co., 620 So.2d 315 (La.App. 4th Cir.), writ denied 629 So.2d 414 (La.1993). Also greater weight should have been given to the physicians expert in diagnosing brain injuries. The opinion of an ophthalmologist or an orthopedic surgeon on the subject of a brain injury should not be given as much weight as that of a neurologist or specialist in physical and rehabilitative medicine.
Finally, the trial court did not allow Dr. Bell, the neuropsychologist whose test results were so instrumental in the diagnosis of plaintiff's brain injury to testify as to her opinion regarding whether plaintiff sustained a brain injury because she is not a medical doctor. Plaintiff assigns this ruling as error because La.R.S. 37:2352 specifically allows a clinical psychologist to make a diagnosis of mental and emotional disease or disability. Additionally, plaintiff observes that the medical doctors relied on the evaluation testing and examinations by Dr. Bell in this case. We find that because the medical experts did testify as to how the results of Dr. Bell's testing supported a finding of a brain injury, *706 Dr. Bell's inability to render an opinion was harmless error.
Having found that plaintiff suffered a brain injury and that it was causally connected to the December, 1987 accident, we must reconsider the trial court's award for loss wages or diminution of earning capacity. The trial court found that plaintiff's past, present and future loss of wages and earnings capacity amounted to $150,000.00. This award appears to be based on an earnings history as opposed to an earnings capacity and the trial court failed to articulate whether its award was a total permanent loss of future wages or something less.
Plaintiff argues that the trial court erred in failing to base its award on her earnings capacity. She had recently graduated from college which improved her earning capacity significantly. All previous tax returns reported her income as a student/artist and she had become a professional artist at the time of the accident. Plaintiff cites Smith v. Two (R) Drilling, 606 So.2d 804 (La.App. 4th Cir.1992), writ denied 607 So.2d 560 (La. 1992) to support her argument.
Plaintiff's expert, Dr. Wolfson, a forensic economist, provided present day values for plaintiff's diminution of earnings capacity based upon figures provided by Doug Kuylen, a vocational rehabilitation specialist. Mr. Kuylen testified that as a college graduate, plaintiff's earning capacity was within the range of $18,225.00 and $27,495.00. Dr. Wolfson calculated that, at a minimum, plaintiff's past lost wages amounted to $109,077 and future lost wages amounted to $373,042.00. At the suggestion of plaintiff's counsel Dr. Wolfson was asked to assume that plaintiff would eventually get a job paying minimum wage. The minimum wage amount was set-off from the amount calculated for future lost wages for a total of $216,314.00. These calculations used an annual salary of $15,000.00 as a basis with percentage increases over plaintiff's work life up to retirement age of 59½ years and were discounted for present day value.
Defendant's expert, Dan Cliffe, a certified public accountant specializing in economic analysis, based his calculations on former tax returns. He calculated plaintiff's past lost wages to be $35,816 and future lost wages to be in the range of $57,241.00$70,147.00 depending on wage percentage increases over the course of fifteen years. The trial court's award of $150,000.00 is far closer to defendant's expert than plaintiff's expert.
Both experts conceded that calculating wages for professional artists is very speculative and that it could even be below the minimum wage. Because plaintiff has no history as a professional artist (she was working on her first commission as a professional artist at the time of the accident) such a calculation would be entirely arbitrary. Plaintiff testified that she has resumed her career as a professional artist but only with great difficulty and without much success so far. Testimony by artist/former employer Adrian Deckbar indicates that plaintiff lacks many of the characteristics an artist needs to be successful; namely endurance, ability to see well, a clear mind, self-motivation and organization.
It was error for the trial court to rely on the calculations of Mr. Cliffe. As Dr. Wolfson testified, because plaintiff's previous tax returns were from her college days they did not reflect her earning capacity. Prior to her accident, plaintiff worked as a student/artist or waitress and attended school full-time. We find that Dr. Wolfson's calculations are more reasonable in light of Mr. Kuylen's testimony regarding the income levels of college graduates.
We must also reconsider the trial court's award of $55,995.37 for medicals because the trial court's award for future medicals did not contemplate a brain injury. In light of our finding that plaintiff sustained a brain injury that was causally connected to the December, 1987 accident we must increase the trial court's award for medicals.
We find that Boh Bros. is liable for all of plaintiff's past medical expenses, $45,495.37 and future medicals relative to brain injury rehabilitation, a personal attendant and medical treatment. We make this finding based on the testimony of plaintiff's treating physicians, Dr. Jamison and Dr. Rosenbloom, who both recommended brain injury rehabilitation *707 for plaintiff and assistance overcoming lifestyle problems.
It was also Dr. Ferris' opinion that plaintiff had improved while in the New Medico rehabilitation program from March of 1991 through May of 1991, so he thought she would continue to improve and profit by rehabilitative efforts. The State of Louisiana's rehabilitation counselor/specialist, Terrence Kennedy, who had served on the committee which recommended that plaintiff attend New Medico, testified that plaintiff was not precluded from trying another rehabilitation program even though she had experienced adjustment problems at New Medico.
The only testimony as to the cost of brain injury rehabilitation was provided by Dr. Voogt. Dr. Voogt, a vocational rehabilitation expert designed a life care plan for plaintiff. He testified that a six to twelve month residential brain injury rehabilitation program would cost $170,000.00. Increases for follow-up care connected with brain injury rehabilitation, including psychiatric treatment of $16,000.00 and therapy in the cognitive area, thinking process and decision-making, of $64,000.00 would raise this amount to $250,000.00. The discounted total award for brain injury rehabilitation and follow-up treatment is $232,750.00.
Using Dr. Voogt's figures, Dr. Wolfson calculated the present day values for an attendant on an 8, 12, 16 and 24 hour a day basis. Dr. Voogt felt that a personal attendant for plaintiff was essential to insure productivity. A personal attendant could assist plaintiff in overcoming some lifestyle problems that she has developed; namely inability to perform housekeeping responsibilities, conducting personal errands and handling financial matters, and motivating her to interact socially and function in public. On an eight-hour a day basis Dr. Voogt testified that the cost of a personal attendant would be $38,779.00 a year.
We disagree with Dr. Voogt that plaintiff's lifestyle problem would require a personal attendant on an eight-hour a day basis. A personal attendant is a skilled worker that earns between $9-$15 an hour. Where we are compensating plaintiff for rehabilitation and on-going counselling and psychiatric visits, an award for a personal attendant to motivate and encourage plaintiff to be more productive appears to be duplicative. Plaintiff testified that she lives in a studio apartment therefore housekeeping responsibilities are minimal. Personal errands such as grocery shopping and budgeting and balancing a checkbook could all be done weekly as could the housekeeping responsibilities. Furthermore, these are not tasks that plaintiff will need a skilled worker to perform. Additionally plaintiff testified that she is still in possession of her driver's license which affords her freedom of movement if she elects to buy a car. Therefore, we reject Dr. Voogt's recommended award of $1,255,470.00 for a personal attendant.
Dr. Wolfson made a calculation for loss of personal services in the amount of $118,691.00, which represents 20 hours of service a week by an unskilled worker at $4.25 per hour. Although Dr. Wolfson calculated that plaintiff had a 46 year life expectancy, he recommended that plaintiff be compensated for this lost through age 70. As an older uninjured adult, the likelihood exists that plaintiff would have similar lifestyle problems. Because plaintiff's lifestyle problems have not rendered her dysfunctional and because she has demonstrated some improvement functioning on her own, we find that an award in the amount of $47,476.00, based on $4.25 an hour for 8 hours a week through age 70 is reasonable in this case.
An additional annual expense of $258.00 for medical attention by plaintiff's treating physician and psychiatrist must be added to the recurring expense of a personal attendant. Although stable, plaintiff continues to require some monitoring of both her physical and psychiatric condition. Like the award for loss of personal services this expense is awarded through age seventy, amounting to $8,407.00. We therefore award plaintiff $334,128.37 representing $45,495.37 in past medical expenses, $232,750.00 for brain injury rehabilitation, $47,476.00 for loss of personal services and $8,407.00 for medical treatment.
Finally, this Court must reconsider the trial court's general damage award which *708 did not contemplate a brain injury, only an aggravation of a borderline personality disorder. The trial court awarded $200,000 in general damages in compensation for the aggravation of a preexisting borderline personality disorder. In its reasons for judgment the trial court wrote:
As a result of the December 9, 1987 collision plaintiff suffered a sixth nerve palsy or a compensated esotropia, which was corrected by surgery, and some orthopedic problems which for the most part were resolved eventually. Plaintiff's principal claim is that she suffered brain damage as a result of the December 1987 accident.
Plaintiff cites two Supreme Court cases Miley v. Landry, 582 So.2d 833 (La.1991) and American Motorist v. Rent-All, 579 So.2d 429 (La.1991) which awarded a plaintiff $300,000 whose preexisting borderline personality disorder was exacerbated by an injury. Plaintiff submits that where she has suffered a life altering injury her general damages would approximate $1,000,000.00.
Recent case law relative to general damage awards for brain injury victims range from $75,000.00$1,900,000.00. Davis v. State, Dept. of Trans. and Development, 94-308 (La.App. 3 Cir. 12/7/94), 647 So.2d 552, writ denied 95-0034 (La. 1/27/95), 649 So.2d 382; Hoyt v. State Farm Mut. Auto. Ins. Co., 623 So.2d 651 (La.App. 1st Cir.), writ denied 629 So.2d 1179 (La.1993); Horton v. McCrary, 620 So.2d 918 (La.App. 3 Cir.1993), affd. in part, rvsd. in part, on other grounds 93-2315 (La. 4/11/94), 635 So.2d 199; Hood v. State Through Dept. of Transp. and Development, 587 So.2d 755 (La.App. 2d Cir.), writs denied 590 So.2d 81, 82 (La.1991). The lowest of these awards was to Michael Hoyt and the $75,000.00 awarded to him was more in compensation for pain and suffering and mental anguish than a brain injury because he had a preexisting learning disability. The highest of these awards was to Ms. Davis, a thirty-two year old mother whose two minor children were also injured in the same accident. She was comatose for several weeks, suffered multiple fractures and lacerations of the face and head. These injuries caused permanent facial scarring and tightness of the eyelid and visual distortions which caused sleeplessness due to Ms. Davis' inability to close her left eye completely. Additionally Ms. Davis was orthopedically disabled and suffered from traumatic arthritis. Although she was diagnosed with a preexisting psychiatric condition her functional level dropped 30% after the accident and her prognosis remained poor.
We find that plaintiff in the instant case suffered damages more factually similar to plaintiffs in Horton and Hood where general damages amounted to $750,000.00 and $800,000, respectively. Mr. Horton was a 45 year old executive whose brain injury slowed his thought process, reduced his ability to process information, impaired his memory and resulted in emotional problems. Like plaintiff in the instant case, Mr. Horton also suffered physical problems but other than double vision these had more or less been corrected and his permanent disability was the brain injury. The plaintiff in Hood was a ten year old boy. The expert testimony established that he had a chronic sense of discouragement and dejection, his IQ dropped from 120 to 85, and he was not expected to finish high school without significant psychological scars. His likelihood of marriage and having children was very low.
Ms. Bernard's IQ dropped from 113, while in high school, to 83, after her accident. Her most severe deficiencies are in the areas of concentration and memory which affects all aspects of her life. We feel that the lowest reasonable award for general damages is $750,000.00.
For the foregoing reasons we reverse the trial court's finding that damages were limited to the aggravation of a preexisting borderline personality disorder. We find that plaintiff suffered a brain injury and damages are increased as follows to reflect this finding:

Past, present and future
physical and mental pain and
suffering $750,000.00
Past, present and future
medical expenses $334,128.37
Past, present and future loss
of wages and earnings capacity $325,391.00
 _____________
 $1,409,519.37

*709 Since the trial court found Boh Brothers to be 75% at fault, judgment will issue in favor of plaintiff and against Boh Bros. in the sum of $1,057,139.53 dollars and all costs of these proceedings with legal interest thereon from date of judicial demand until paid.
AFFIRMED, IN PART REVERSED, IN PART AND RENDERED.