GOTHARD, Judge.
This is a consolidated case arising from an automobile accident in which two persons were injured. One plaintiff has settled her case. From judgment notwithstanding the verdict in favor of the remaining plaintiff, both the defendant and plaintiff have appealed.
The appellant, Jane Hoogerwerf, then 33 years old, was injured on February 23, 1983, when her car was struck from the rear by the vehicle of the defendant, Albert Baltazar. She was treated for neck pain and headaches by a chiropractor over the ensuing months, later consulting an orthopedist, and finally undergoing tests including a myelogram, from which a diagnosis of ruptured cervical disc was made. Surgery was performed in November, 1985. Mrs. Hoogerwerf claims permanent damage to the spinal cord because of the surgery itself and permanent nerve damage to the right leg and foot and to the fingers of her left hand diagnosed as Brown Sequard syndrome, a condition allegedly resulting from the surgery.[1]
Suit was filed on February 23, 1983 against Albert Baltazar and his insurer USF & G. A jury trial was held and, at the close of the defendant’s case, the plaintiff moved for a directed verdict on liability and on medical causation. The trial court granted a directed verdict, finding the defendant solely liable for the accident, but denied the plaintiff's motion as to medical causation. The jury found in favor of the plaintiff, awarding general damages of $17,500 and special damages of $5,000. *1293 The court adopted the verdict as its judgment and ordered the defendant to pay, in addition to the damages, interest from date of demand, expert witness fees and costs. On June 15, 1987, the judge heard the plaintiff’s motion for judgment notwithstanding the verdict, or new trial, or in the alternative additur. The judge granted judgment notwithstanding the verdict and ordered that a new trial on quantum only be held in the event that his verdict was reversed on appeal. The judgment NOV awarded general damages of $165,000 and $19,497.37 in special damages plus interest, expert fees, and costs.
The issues raised by the defendant are: (1) whether the court should have been precluded from granting a judgment notwithstanding the verdict when it had previously denied a directed verdict on the same issue; and (2) whether the evidence presented at trial supported a motion notwithstanding the verdict.
The six issues raised by the plaintiff all relate to one question: whether the trial court’s award of $165,000 in general damages should be increased, as the plaintiff has sustained permanent injuries.
JUDGMENT NOTWITHSTANDING THE VERDICT, AFTER DENIAL OF DIRECTED VERDICT
The defendant first contends that the trial judge granted the judgment notwithstanding the verdict in error, when he had previously denied the motion for directed verdict on the same facts and when the standards for granting the two motions are the same. La.C.C.P. arts. 1810,1811. This court summarized the jurisprudence as follows in Brannan v. Wyeth Laboratories, Inc., 516 So.2d 157, 165 (La.App. 5th Cir. 1987), writ granted 519 So.2d 109 (La.1988):
The standard to be applied in ruling on a motion for judgment notwithstanding the verdict is the same as that used on a motion for directed verdict. Campbell v. Mouton, 373 So.2d 237 (La.App. 3 Cir. 1979). Either of those motions is properly granted where the facts and reasonable inferences point so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Courtney v. Winn-Dixie Louisiana, Inc., 447 So.2d 504 (La.App. 5 Cir.1984), writ denied, 449 So.2d 1359 (La.1984). All of the evidence should be considered in the ruling on the motions, not just the evidence supporting the non-mover’s case, and it should be considered in the light most favorable to the opposing party. Courtney, supra; Oppenheim v. Murray Henderson Undertaking, 414 So.2d 868 (La.App. 4 Cir.1982). Furthermore, factual findings of the trial court cannot be overturned by the appellate court unless it is determined the factual findings were manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
While the court’s decisions were of necessity based upon the same facts, the grounds for the motions were different. In both situations the judge’s reasons from the bench indicate that he applied the correct standards. In denying the directed verdict on causation of the ruptured disc that required surgery, he stated that, as the possibility of a trauma subsequent to the automobile accident had been raised by the physicians’ testimony, the jury should determine “whether or not the injury ultimately sustained ... by Ms. Hoogerwerf had a causal connectivity to the accident in question.” He granted the judgment NOV on damages, determining that the award was inconsistent with the jury’s finding that the accident was a proximate cause of the plaintiff’s injuries. We find no procedural error in the judge’s rendering judgment notwithstanding the verdict.
SUFFICIENCY OF EVIDENCE TO SUPPORT JUDGMENT NOTWITHSTANDING THE VERDICT
At trial and in the appellate brief, the defendant’s position is that although Mrs. Hoogerwerf did receive minor injuries in the accident, the ruptured disc, occurring more than two years later, did not result from that accident but from an intervening event and he is not liable for the plaintiff’s *1294 damages resulting therefrom. He asserts that the award of the jury, general damages of $17,500 and special damages of $5,000, was adequate compensation. The plaintiff contends that the February 23, 1983 accident alone caused all her medical problems, that she was entitled to the court’s award of increased damages, and that because of her permanent disabilities she is entitled to a further increase over the amount of the judgment notwithstanding the verdict.
At this point, a review of the evidence is necessary to our evaluation and resolution of the issues. The sequence of events as established at trial is as follows.
On February 23,1983, after the accident, Mrs. Hoogerwerf and a friend drove her car across the Causeway, to St. Tammany Hospital emergency room, after which she drove herself to her home in Covington. Her head hurt almost immediately after the collision and she felt a burning sensation in the back of her head. From then on until the surgery she had headaches and pain in her neck. She stayed home from work two days, returning to work after the intervening weekend.
On March 3, 1983 she consulted Dr. Jeffery B. Karas, a chiropractor, who treated her daily at first, then at gradually longer intervals through January 25, 1984.
On February 23, 1984 the petition in this suit was filed.
On March 2, 1984 and again on May 31, 1984, she consulted an orthopedic surgeon, Dr. Kenneth Adatto.
On July 19, 1984 she was examined by Dr. Russell C. Grunsten, an orthopedic surgeon, at the request of the defendant’s insurer U.S.F. & G.
On October 4, 1984, referred by her attorney, she saw Dr. John D. Jackson, a neurosurgeon.
A year later, on October 5, 1985 she consulted Dr. Claude Williams, an orthopedic surgeon, to whom her husband’s cardiologist referred her. On his recommendation, on about November 20, 1985 she underwent a myelogram, which disclosed a ruptured disc. She was seen in the hospital by Dr. Melvin Parnell for USF & G, who acquiesced in the diagnosis. Dr. Williams performed a discectomy and cervical fusion on November 26, 1985.
On November 21, 1986 Mr. and Mrs. Hoogerwerf filed a malpractice suit against Dr. Williams and others for negligence in the myelogram and/or the surgery which allegedly caused symptoms diagnosed as Brown-Sequard Syndrome.
The defendant argues that the manner in which Mrs. Hoogerwerf conducted her daily life from the time of the accident until diagnosis of the ruptured disc raised serious doubt that the accident caused the ruptured disc. The testimony of the plaintiff indicates that she was absent from work only when medically necessary and returned to work twelve weeks after the surgery. Prior to the accident Mrs. Hoo-gerwerf had been extremely athletic, participating in competitive sports such as volleyball. After the accident she played volleyball and racketball, although not so strenuously, with the acquiescence of Dr. Karas, her chiropractor, and with her neck hurting. She testified that she discontinued sports sometime in the summer of 1984. She took no prescription medication until the surgery except for a brief period she consulted Dr. Adatto. For the rest of the time she used Ascriptin, an over the counter pain killer. The defendant points out that she sought no treatment other than chiropractic until March, 1984 and then, after consultations with Drs. Adatto, Grunsten, and Jackson, received no treatment at all between October, 1984 and October, 1985. The defendant finds Mrs. Hoogerwerf’s conduct incompatible with that of a person who is in constant pain.
The defendant further argues that his expert physician witnesses, Drs. Grunsten and Parnell, both testified that they believed the ruptured disc was unrelated to the accident and suspected on intervening trauma. A review of Dr. Grunsten’s testi *1295 mony reveals that he found no spasm on either side of the neck and a full range of motion in each direction with discomfort in extremes of rotating to the left. He was concerned about the tingling in the left hand which the plaintiff told him had been present for a year and a half. He recommended that she have an electromyogram and nerve conduction study for the neck and left upper extremity for nerve damage. Dr. Grunsten reported that he found no symptoms suggestive of a recently ruptured disc in his 1984 examination and remarked that simply a rapid movement of the head may cause a herniated disc. He concluded that there was a triggering episode shortly before the acute symptoms that appeared in 1985. Dr. Parnell’s examination was performed in the hospital, between the myelogram and the surgery. Mrs. Hoogerwerf tensed her muscles to such an extent, that he was unable to get an accurate picture. He agreed that she had a ruptured disc at the C5-6 level, but found it hard to relate to an event three years earlier if the intervening examinations were normal.
The plaintiff’s reponse to questions regarding her choosing a chiropractor instead of a physician was that she believed she would improve. When she saw Dr. Adatto, he told her that he did not recommend surgery at that time. She attempted home traction but found it painful and it did not relieve her pain. Dr. Jackson, whom she saw a few months later, gave her no conclusive explanation of her continuing problems — headaches, neck pain, and the tingling sensation down her arm. Dr. Jackson explained that a myelogram or disco-gram would establish the source of her pain but that she should not submit to these tests unless her pain became intolerable. She testified that she finally agreed to the myelogram and surgery if needed because a psychologist helped her face the effect her physical problems were having upon her marriage and her children. Even after making the decision she was so fearful of the myelogram that she can-celled the first appointment; she said she was acutely aware of the risks, which included paralysis, nerve damage, and even death. Mr. Hoogerwerf confirmed her fear of doctors, hospitals and needles. Her explanation for her failure to consult a physician early on was that she felt comfortable with thé chiropractor and she had improved somewhat.
The plaintiff’s counsel points out that Mrs. Hoogerwerf described the same symptoms to each physician and that none had found signs of a ruptured disc upon examination. Dr. John D. Jackson, a neurosurgeon, reported a normal neurological examination, although she complained of pain with left lateral flexion and anterior flexion of the neck. He testified that he felt the complaints of neck and arm pain and the prolonged existence of the complaints suggested a cervical disc injury; while he would have expected objective signs of nerve root compression and irritation to occur weeks or months after the trauma, a ruptured disc can develop gradually over time. The plaintiff’s surgeon, Dr. Claude Williams, suspected a disc problem on Mrs. Hoogerwerf’s first visit but found no specific sign of a compressed nerve. He believed she had had the problem several years, stating that if a disc is weakened, very minor amounts of strain can cause the disc to protrude. Although he too would have expected to see clinical evidence sooner, he felt the problem was caused by the wreck. He explained further that her having had a normal neurological examination a year before the surgery did not necessarily mean that a damaged disc was not present but only that it was not causing pressure in the neurological system.
Although it may be difficult to understand Mrs. Hoogerwerf’s choosing to accept only minimal treatment for her problem and also her apparent insistence on maintaining status quo as to her work activity, and to a lesser extent her physical activity, despite continuing pain, we do not find that such a choice means that her neck problem did not continue from the date of the accident until surgery. Each of the lay *1296 and medical witnesses who were questioned as to their awareness of any intervening incident that might have triggered the ruptured disc responded in the negative. Accordingly, we find no error in the jury’s finding that the accident of February 23, 1983 was a proximate cause of all Mrs. Hoogerwerf’s injuries.
The interrogatories completed by the jury read as follows:
JURY INTERROGATORIES
1) Was the fault of Albert Baltazor, a proximate cause of the damages sustained by plaintiff, Jane F. Hoogerwerf?
YES ✓ NO_
If your answer is YES, answer question two.
If your answer is NO, stop here, sign the form and return to the courtroom.
2) Without consideration any degree of fault or any percentage of fault attributed to each party, what sum in damages, if any, do you find was sustained?
We, the jury, award the following damages to plaintiff, Jane F. Hoogerwerf:
General Damages: $17,500.00
Special Damages: $5,000.00
Gretna, Louisiana, this 16 day of January, 1987.
The defendant argues that the damages awarded by the jury indicate that they found the plaintiff was entitled to compensation only for the immediate injuries incurred in the accident and that the ruptured disc was not related. The trial judge stated that he submitted the interrogatory . “to prevent any confusion as to which accident proximately caused the injury.” We note further that if the defendant felt that the interrogatory was confusing, he was entitled to object, under La.C.C.P. art. 1812(B). There is nothing in the record to indicate that he made an objection. As the stipulated medical damages were $19,-417.37, the jury award was so low as to be an abuse of discretion and reasonable minds could not differ as to the fact that a much higher award was justified. Accordingly, we find that the trial judge acted properly in rendering judgment notwithstanding the verdict on the issue of quantum.
QUANTUM
It is understandable that the plaintiff might feel her award to be inadequate when she was the innocent party in a collision. Her cervical spine is fused permanently. There is no indication from the testimony of neurologists who examined her after the surgery that the problems related to Brown-Sequard Syndrome will improve, only that she will learn to adjust to the condition. She has difficulty using her fingers and in walking. To a formerly strong and athletic young woman these disabilities are particularly serious. She is not seeking economic damages nor future medical expenses. Nevertheless, only where it is found that the trier of fact has abused it discretion may an award be disturbed on appeal and then it may be raised only to the lowest reasonable award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
It is apparent that the trial judge took into account all the evidence in the record, in rendering judgment notwithstanding the verdict and in making the increased award, and we find no abuse of discretion. Accordingly, we shall not consider amounts awarded in comparable cases.
For the reasons assigned, the judgment of June 15, 1987 is affirmed.
AFFIRMED.

. Brown-Sequard syndrome. A condition resulting from an injury, inflammation, tumor, etc. involving one half of the spinal cord, i.e., affecting the spinal cord on one side only. The symptoms are as follows: paralysis or weakness of the muscles on the same side of the body as the injury. Impairment of the sense of touch, vibration, and position on the same side. Loss of sensation for temperature and pain on the side of the body opposite to the side on which the injury of the spinal cord took place. Also called Brown-Sequard paralysis.
Schmidt's Attorney’s Dictionary of Medicine, V.l, B-115.