656 So.2d 700 (1995)
Jody Seagers, Wife of/and David SEAGERS
v.
Max PAILET, M.D.
No. 95-CA-52.
Court of Appeal of Louisiana, Fifth Circuit.
May 10, 1995.
*703 Richard L. Weil, Guste, Barnett & Shushan, New Orleans, for defendant-appellant.
B.R. "Bobby" Malbrough, Metairie, for plaintiffs-appellees.
Before KLIEBERT, DUFRESNE and WICKER, JJ.
KLIEBERT, Chief Judge.
Plaintiffs, Jody and David Seagers, filed this medical malpractice action against Dr. Max Pailet, defendant, alleging breaches in the standard of care in his treatment of plaintiff, Jody Seagers. Defendant, an obstetrician/gynecologist (OB/GYN), treated plaintiff during her third pregnancy, performing a repeat caesarean section (C-section) on August 11, 1987. After surgery, plaintiff experienced painful intercourse, fever, stress urinary incontinence, repeated bladder infections, and a bulbous region in her groin. Dr. Pailet continued to see plaintiff over a two year period, and performed a tubal ligation and hernia repair in August, 1989. This second surgery did not relieve plaintiff's symptoms, and on April 3, 1990, plaintiffs filed a complaint requesting that a Medical Review panel be convened. By mutual agreement of the parties, the medical review panel was waived and suit was filed on July 26, 1990. On January 4, 1991, defendant filed a Peremptory Exception of Prescription which was heard and denied on February 22, 1992.
A jury trial was held on August 18-19, 1994. The jury found in favor of the plaintiffs, but attributed 22% fault to plaintiff, Jody Seagers, for failure to mitigate her damages. (Dr. Pailet was assessed the remaining 78% of fault). The jury awarded plaintiff Jody Seagers $54,179.58 for past physical pain and suffering, $53,750.00 for mental anguish and emotional distress, $2,638.58 for past medical expenses, and $10,166.67 for past lost wages, for a total of $120,734.83, all to be reduced by plaintiff's percentage of fault. David Seagers, who was not found at fault, was awarded $21,250.08 for loss of consortium.
Plaintiffs filed a motion for judgment notwithstanding the verdict, asking that the amount of damages be raised. Defendant also filed a motion for JNOV, or in the alternative, motion for new trial. The trial *704 court granted plaintiffs' motion in part to raise the award for past medical expenses to the stipulated amount of $28,620.77 (raising plaintiff Jody Seagers's damages to a total of $146,717.02), but denied the defendant's request for JNOV.
Thereafter, Dr. Pailet filed a motion for suspensive and devolutive appeal. Plaintiffs filed an answer to the defendant's appeal.
On appeal, defendant raises the following assignments of error:
1) the trial court erred in denying defendant's peremptory exception of prescription;
2) the trial court erred in not allowing certain jurors dismissed for cause, because of prejudice regarding abortion; and that plaintiffs' counsel acted to create that prejudice during voir dire;
3) the trial court erred in finding that defendant breached the standard of care;
4) the trial court erred in not qualifying Dr. Pailet as an expert in general surgery;
5) the trial court erred in not finding Mrs. Seagers 100% at fault;
6) the trial court awarded excessive damages; and
7) the trial court erred in amending the jury verdict to award the stipulated past medical expenses.
In plaintiffs' answer to the appeal, they seek the following:
1) that the monetary damage awards determined by the jury be increased;
2) that plaintiff Jody Seagers be found free of fault; and
3) that defendant be sanctioned for filing a frivolous appeal.
For the reasons below, we amend the judgment in the the following respects: We reduce the percentage of plaintiff's fault to -0-; we raise the award for pain and suffering to $75,000.00; we raise the award for mental anguish and emotional distress to $75,000.00 (raising Mrs. Seagers's total damages to $188,787.44),[1] and we raise Mr. Seagers's loss of consortium award to $75,000.00.

FACTS
Both parties agree that Mrs. Seagers first saw Dr. Pailet on February 17, 1987. After that, the testimony is highly divergent. Plaintiffs testified that David Seagers and Jody Manning met in Texas while both were working at a Houston's Restaurant, he as a manager trainee, and she as a waitress. Shortly afterward, David was transferred to New Orleans to work at the Metairie Houston's. In January 1987, he moved Jody and her son by a previous relationship to New Orleans. Jody testified that in February 1987 she was experiencing irregular bleeding and asked a fellow employee at Houston's to recommend a gynecologist. This person recommended Dr. Pailet. David drove Jody to the appointment and waited for her (they were not married at the time). Jody testified that she did not know she was pregnant until Dr. Pailet performed a test on that day. Dr. Pailet testified that plaintiffs came to him for an abortion, which he refused to perform because plaintiff was 20 weeks pregnant, beyond the time Dr. Pailet could perform one. Both plaintiffs emphatically disagree that Jody desired an abortion. Dr. Pailet's records show that he or his staff recorded plaintiff as having six past abortions. (Dr. Pailet's record keeping will be discussed, infra.)
In any event, the Seagerses were married in April, and Jody returned to Dr. Pailet for her prenatal care and delivery on August 11, 1987, delivering a healthy 6 lb. 12 oz. girl. The delivery was performed by repeat C-section since Jody had had a previous C-section with complications in 1979, and an ectopic (tubal) pregnancy in 1981, necessitating abdominal surgery to remove her left tube and ovary. Here, the testimony diverges. The plaintiffs claim that after delivering the baby, Dr. Pailet walked out with Mr. Seagers, the baby, and the pediatrician, stopping at the nurses' station and removing his gloves and mask, leaving his surgical assistant (a non M.D.) to close Mrs. Seagers's abdomen. Dr. Pailet insists that he closed Mrs. Seagers himself.
Upon her arrival home, plaintiff began to experience a number of problems. She had *705 stress urinary incontinence, urinating on herself whenever she lifted something, sneezed, or the like. She also developed a large bulbous region in her groin (a "jock strap hanging thing" according to David). She began to experience fever, chills, and urinary tract infections. In November, the first time plaintiffs attempted to have sexual intercourse after the birth, plaintiff urinated on her husband and experienced pain. The next time, the intercourse was so painful to plaintiff that she almost became physically sick. Both plaintiffs testified that the marital relationship virtually came to a halt at that time.
Jody saw Dr. Pailet several times regarding her symptoms. She testified that she trusted him when he advised her that the symptoms were temporary and would resolve themselves.
At this point we note that Dr. Pailet's medical records regarding his treatment of plaintiff submitted at earlier times were different from those subsequently delivered for depositions. Originally, in 1992, Dr. Pailet furnished these records to his attorney who in turn produced them to plaintiffs' counsel pursuant to a routine discovery subpoena duces tecum. However, in 1993 at his deposition, the records which defendant brought with him differed from the set he had produced a year earlier in discovery. Dr. Pailet's records contained numerous additions to plaintiff's charted information. At the deposition, Dr. Pailet was at a loss to explain the extra information contained in his records. However, at trial, defendant explained that when he reviewed the records in preparation for the deposition, he made additions of conversations he remembered with plaintiff, in order to make the record more complete. He denied any wrongdoing in making the additions. Dr. Pailet said that in 1992, when he produced the records to his attorney, he was not aware that he was being sued for malpractice. However, plaintiffs filed suit in 1990. Finally, defendant admitted several times on the stand that he was an extremely poor record keeper. The two surgeons who performed Jody's successful 1992 hernia repair, Drs. Swanson and Improta, agreed. They both opined that his operative dictation from the 1989 surgery was so deficient as to give them no guidance as to what he had done internally to plaintiff.
Additionally, Dr. Pailet's records indicate that plaintiff told him she had had five abortions. This form is not filled out in plaintiff's handwriting, and also misspells plaintiff's name. Plaintiff denies having had any abortions. Another record of Dr. Pailet's shows that plaintiff had four abortions. However, the nurses' preoperative report in 1987 shows only one prior pregnancy (C-section) and one ectopic pregnancy, with which plaintiff agrees. Her records with her doctors in Atlanta and California record no abortions.
In August, 1989, Dr. Pailet performed a tubal ligation and attempted hernia repair on plaintiff. Both parties' testimony regarding this procedure is also very different. Jody testified that because of all her pain and incontinence problems, Dr. Pailet had convinced her that any future pregnancies would be extremely difficult and painful, and might require some procedure to "wire up" her uterus. She testified that he felt she should undergo a tubal ligation, at which time he would also fix the bulge in her abdomen. However, Dr. Pailet testified that he clearly remembered Jody coming to him, very desirous of a tubal ligation, in light of her "six" previous pregnancies, and that she also wanted a tummy tuck. The plaintiffs deny this. Jody was only 29 years old in 1989, and testified that both she and her husband wanted another child, hopefully a son, but deferred to Dr. Pailet's professional opinion that no further pregnancies were advisable.
The 1989 operative report mentions a bilateral tubal ligation; however, this is another error in the record as in 1981, plaintiff had undergone the removal of one tube and ovary with her ectopic pregnancy.
Plaintiff testified that when the 1989 surgery failed to alleviate any of her symptoms, and the large bulbous area in her abdomen remained, she began to question Dr. Pailet's judgment. Jody said that she began to look for other doctors to give opinions about her condition. Initially, she asked Dr. Pailet for a plastic surgeon to augment her breasts, although she said this was merely a ruse to get the name of a surgeon, Dr. Schwartz. She also saw three other doctors (Drs. Branning, *706 Dupin, and Stolier), whom she claimed were vague in their discussions with her about her condition.
In 1990, the plaintiffs were transferred to Atlanta, where plaintiff sought medical advice from Dr. Bourdeaux. He noted that upon just minimal palpitation of her abdomen, plaintiff experienced serious pain. Dr. Bourdeaux referred plaintiff to Dr. Bruce Green, a urologist, to evaluate her urinary incontinence. Plaintiff testified that surgery was scheduled, but three weeks before the date, plaintiffs were again transferred, this time to Los Angeles. Five months after moving to Los Angeles, plaintiff underwent a hysterectomy and successful ventral hernia repair with Drs. Robert Improta and Gary Swanson, and testified that she has been symptom free ever since.

EXCEPTION OF PRESCRIPTION
In their petition, plaintiffs allege that the defendant committed acts of malpractice at both the August 11, 1987 C-section and the August 17, 1989 tubal ligation and hernia repair. Testimony by plaintiff showed that following the C-section, plaintiff developed a bulbous region in her groin and had stress urinary incontinence. When attempting sexual intercourse with her husband in November, she urinated on him and the intercourse was painful. Subsequent attempts at intercourse caused the plaintiff such pain so as to make her physically sick. Additionally, plaintiff developed frequent urinary tract infections with fever and chills. However, plaintiff testified that Dr. Pailet advised her that the incontinence and painful intercourse were temporary and would eventually resolve. Plaintiff testified it was only after the second surgery, when none of her symptoms were resolved, that plaintiff began to suspect that Dr. Pailet may have committed malpractice. (Indeed, it was not until plaintiff had reconstructive hernia repair and a hysterectomy in 1992 that she learned her bladder had been mispositioned during the 1987 C-section, which likely caused her pain and urinary tract problems, according to Drs. Improta and Swanson, who performed the 1992 surgery.)
Defendant argues that plaintiff knew immediately after the 1987 C-section that something was wrong and thus had the knowledge necessary to trigger the running of prescription. Defendant also asserts that plaintiff was aware in 1987 that someone other than Dr. Pailet closed the abdomen at her 1987 C-section, and therefore this put her on sufficient notice to begin prescription. However, we note that this issue was hotly contested and apparently never conclusively resolved. Plaintiffs claim that Dr. Pailet's surgical assistant closed the abdomen without Dr. Pailet's supervision, contrary to the rules and policies of East Jefferson General Hospital. However at deposition and trial, Dr. Pailet vehemently denied that anyone had closed Mrs. Seagers's abdomen but him.
It is settled law that even if a medical malpractice victim is aware that an undesirable condition has developed after medical treatment, prescription does not run as long as it is reasonable for the victim not to recognize that the condition is related to alleged malpractice. Stevenson v. Touro Infirmary, 94-0466 (La.App. 4th Cir. 5/26/94), 640 So.2d 633. A mere apprehension that something is wrong will not begin the prescriptive period. A plaintiff cannot be charged with the knowledge of a doctor's negligence for purposes of prescription when the plaintiff continues to believe the doctor's explanation. Stevenson, supra; Griffin v. Kinberger, 507 So.2d 821 (La.1987); Gunter v. Plauche, 439 So.2d 437 (La.1983).
The record shows that plaintiff's symptoms and abdominal disfigurement developed virtually immediately after the August 11, 1987 C-section. Between the C-section and the tubal ligation on August 17, 1989, she saw no other doctor than Pailet, and continued to report to him her symptoms and concerns. She testified that she trusted him and believed him because he explained things to her in layman's terms. Jody testified that Dr. Pailet said the symptoms were temporary and would resolve over time and that he said the 1989 surgery would "fix things." When the surgery did not alleviate any of plaintiff's problems, she began seeking other doctors' opinions. Suit was filed July 26, 1990, less than one year after the 1989 surgery. We *707 believe it especially significant that plaintiff did not learn of the misplacement of her bladder until the surgery in California in 1992. Under this factual scenario, we agree with the trial court's ruling that plaintiffs' suit was not prescribed.
Next, Dr. Pailet contends that the trial court erred in not allowing certain jurors, Mr. Ledieu and Ms. Linns, dismissed for cause because of their prejudice regarding abortion, and that plaintiffs' counsel acted to create that prejudice during voir dire.
The issue of abortion was raised on voir dire because defendant claimed that plaintiff originally sought him for an abortion, because his records indicated that she had five or more abortions (both of which plaintiffs deny) and because Dr. Pailet performed abortions as part of his routine practice. On voir dire, plaintiffs' counsel made it clear that abortion itself was only peripherally involved in the case: that Dr. Pailet had not performed an abortion on Mrs. Seagers. During Mr. Ledieu's voir dire, plaintiffs' counsel explained that an issue may arise in trial that plaintiff had asked defendant for an abortion and that defendant did in fact perform abortions as part of his practice, and that the abortion issue had nothing to do with the facts of this case. He said:
"Because there are going to be issues thatthe word `abortion' is going to be mentioned, and what we need to do is make sure that we have a panel of jurors that, when they hear the word `abortion,' they're not going to automatically turn against one party or the other. Okay. And I'll tell you, it's really not an issue in this case, okay, to any degree; but we need to make certain that whatever your position is, you could set that aside and weigh the facts in this case."
Defendant's counsel asked the following question of the jury panel:
"Now, Ms. Bilbe and a couple other jurors have talked about the abortion issue, and we all strive to be fair as much as we can in representing our client's interest. There may be some allegations that Mrs. Seagers had abortions in theabortion or abortions in the past. If such evidence is put before the Court, will you all not hold that against Ms. Seagers? And, likewise, if Dr. Pailet has done abortions in the past, can you be fair and not prejudice Dr. Pailet for doing abortions?
(All indicate affirmatively)."
After reviewing the entire voir dire, we find that both counsels' questions to the jury panel about abortion were conducted in a very similar vein to the above excerpts. Neither counsel showed any intent to prejudice jury members; we believe that questioning was performed in a very objective, non-inflammatory manner. Therefore, we disagree with defendant that the plaintiffs' counsel acted in any way to create prejudice to the defendant regarding this issue.
Moreover, we note that counsel for defendant had two peremptory challenges available when his opportunity to strike Mr. Ledieu arose. Defendant's counsel did not exercise this option. Furthermore, defendant's counsel did not ask a single question of Mr. Ledieu during the voir dire. The last thing Mr. Ledieu said, regarding whether he could set aside his personal feelings on abortion, was: "Yes, I think so. I mean, I have to do that."
Regarding Ms. Linss, again defense counsel failed to ask a single question of her regarding abortion. Ms. Linss stated that if abortion were not an issue in the case, she would not hold it against either side. Defendant chose to exercise his last peremptory challenge on Ms. Linss, and has failed to show that any jurors accepted subsequently to Ms. Linss were unacceptable.
In light of these factors, we see no error in the trial court's refusal to excuse these two jurors for cause.
Defendant next contends that the court erred in finding that he breached the standard of care in his treatment of Ms. Seagers, and that the court erred in finding that he caused damage to plaintiffs.
For a plaintiff to prevail in a medical malpractice action, plaintiff must prove by a preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic *708 physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That the proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
LSA-R.S. 9:2794.
The manifest error rule applies in an appeal of a medical malpractice action; it is the jury's duty to assess the testimony and credibility of all the witnesses and to make factual determinations regarding these evaluations. Alello v. Smith, 94-103 (La.App. 5th Cir. 7/26/94), 641 So.2d 664.
Expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill and knowledge or failed to exercise reasonable care and diligence. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
In a medical malpractice case, the reviewing court must give great deference to the jury's findings when medical experts express different views, judgments, and opinions on whether the standard of care was met in any given case; such expert opinions are necessary sources of proof whose views are persuasive, although not controlling, and any weight assigned to their testimony by the jury is dependent upon the expert's qualifications and experience. Alello v. Smith, supra. Turner v. Massiah, 94-29 (La.App. 5th Cir. 7/1/94) 641 So.2d 610.
When there are contradictory expert opinions concerning compliance with the standard of knowledge, skill, and care for physicians and surgeons, the reviewing court will give great deference to the conclusions of the fact finder. Broadway v. St. Paul Ins. Co., 582 So.2d 1368 (La.App. 2nd Cir.1991); Alello v. Smith, supra.
At trial, plaintiff presented the video depositions of the two doctors who performed the successful hysterectomy and ventral hernia repair in 1992: Dr. Robert Improta, board certified in general surgery and plastic and reconstructive surgery, and Dr. Gary Swanson, board certified in obstetrics and gynecology. Dr. Pailet testified on his own behalf, and presented no other expert testimony.
Dr. Pailet testified that he began treating plaintiff in February 1987, when she came to him for an abortion, although his notes do not indicate this; defendant had an independent recollection of this. (Plaintiff disputes this, as noted above.) He determined that plaintiff was 20 weeks pregnant (although later on cross examination, it was shown that plaintiff's full-term delivery date of August 11, 1987, did not coincide with this calculation). He determined that plaintiff was not a candidate for a vaginal birth after C-section (V-BAC) due to the complications that had arisen with her first C-section in 1979. At trial, Dr. Pailet testified that plaintiff arrived at the hospital between 7:00 and 7:30 a.m. with labor pains; however, the records indicated that the C-section had been previously scheduled for 7:30 that morning. The operative records indicated that the procedure was begun at 7:58 a.m. with the birth at 8:06. When first asked who else was present in the O.R., Dr. Pailet answered that the patient was draped in such a manner that she couldn't see over the drape. When pressed to be responsive, the defendant replied that the nurse, the pediatrician, and his surgical assistant, Eugene Smith, were present. Dr. Pailet denied leaving the O.R. before plaintiff's abdomen was closed, and denied that Smith had performed the procedure. He specifically stated that it was he who had *709 sutured the bladder. However, he evaded answering when asked why he didn't notice the bladder's position at the 1989 surgery. He agreed that if Smith had closed plaintiff's abdomen while unsupervised by Dr. Pailet, it would have been a violation of the hospital's Rules and Regulations.
Regarding the 1989 surgery, Dr. Pailet described how he used a 10 × 12 cm piece of Marlex Mesh (a synthetic material) to aid him in repairing the ventral hernia, because he felt plaintiff had severe abdominal weakness and he specifically worried that the weakness would cause evisceration of the bowel, a potentially life threatening condition. However, he did not list Marlex Mesh on the consent form, because he had not used the mesh in 20 years, and then had only used it once or twice under supervision. Dr. Pailet said he advised plaintiff that she may need a further procedure, a total abdominoplasty, which he was not qualified to perform. However, plaintiff denied ever being so advised. However, at the 1989 surgery, defendant did not consult with another surgeon after seeing the condition of the hernia. He agreed that nothing prevented him from obtaining another surgeon's help, but plaintiff had advised him prior to surgery that she wanted a quick recuperation, and he felt that any other procedure would have violated plaintiff's wishes. Dr. Pailet knew that David Seagers was in the waiting area during this surgery, yet did not ask his specific permission to use mesh or to advise Mr. Seagers that his wife's condition might warrant a more extensive surgery with a longer recuperation. Instead, Dr. Pailet inserted the mesh over the hernial sac and tacked it down at the four corners with absorbable sutures. Dr. Pailet said he did not consult with David during the surgery because David was not the patient and there was no emergency, yet just before this statement, defendant had said he was very worried about the possible evisceration of plaintiff's bowel. Dr. Pailet said that he felt competent to deal with a hernia of "normal magnitude." However, later he admitted that he was not qualified to repair a hernia like the one plaintiff had, and that's why he stopped with the incisional site.
Dr. Pailet's records did not list anywhere that plaintiff had a ventral hernia, large or otherwise. He did note the presence of some adhesions during the 1989 surgery, which he explained as the plaintiff being prone to their development, as some patients are. Adhesions were explained as scar tissue that results from an incision. However, later Dr. Pailet said that adhesions could result from abortions, even though no incisions are made. In a heated exchange with plaintiff's counsel, Dr. Pailet said he had done enough abortions to be an expert and in a normal abortion, no incisions are made, so adhesions would not be a problem.
On redirect, defendant stated that after the 1987 C-section, he replaced Jody's bladder exactly where he found it.
When asked to explain the discrepancy in many of his records as to the number of abortions he believed plaintiff had had, he admitted again to being a very poor record keeper and that perhaps his staff had made mistakes. When plaintiff's counsel asked the relevance of the number of abortions to plaintiff's bladder problems and hernia, Dr. Pailet replied that it had everything to do with her weak cervix, yet a "weak cervix" never appeared in his patient records, because he claimed it was immaterial in his care of plaintiff. Plaintiff's later doctors specifically stated that plaintiff did not suffer from a weak cervix.
Jody testified that immediately following surgery, she felt the fullness in her abdomen and no change in its feeling or looks. She said that Dr. Pailet did not prescribe any king of elastic support garment.
Dr. Swanson saw plaintiff on June 26, 1992, at which time plaintiff complained of chronic pelvic pain and painful intercourse. Dr. Swanson noted that the most impressive examination finding was a large ventral hernia and bulge from the pubic region to the umbilicus, and that the plaintiff was especially tender in the suprapubic region. Because of the size of the hernia, Dr. Swanson did not want to repair it himself, and referred plaintiff to Dr. Improta. Dr. Swanson stated that he was not aware of any OB/GYN who repaired ventral hernias on a regular basis. He believed that Dr. Pailet had violated the *710 standard of care of OB/GYNs in attempting a repair of this magnitude, given Dr. Pailet's training and lack of experience in using Marlex Mesh.
Dr. Swanson believed a hysterectomy would be plaintiff's best option, since conservative treatment had failed to bring plaintiff any relief from the pelvic pain and painful intercourse. The most impressive surgical finding to him was the misplacement of the bladder to the top of the backside of the uterus, instead of its usual position at the lower front side of the uterus. His best guess was that the bladder had been misplaced after the 1987 C-section, since Dr. Pailet's 1989 operative notes do not mention the bladder at all. Dr. Swanson believed that more probably than not, the bad re-positioning of the bladder caused plaintiff's pain, incontinence, and infections. He specifically explained that the normal position of the bladder and urethra prevents urine and bacteria from traveling to the bladder, and that the position of the bladder at the top of the uterus put it "on the stretch," causing the incontinence, infections, and also contributing to the painful intercourse.
Dr. Swanson stated that if he alone had been confronted with the size of plaintiff's hernia during surgery, the first thing he would have done was call in a general surgeon or Dr. Improta for a consultation in the operating room. He believed that Dr. Pailet's failure to call a general surgeon during the 1989 surgery was a breach of the standard of care. He also opined that Dr. Pailet's failure to use drains after the 1989 surgery was a breach of the standard of care. A lack of a drain contributes to a buildup and development of fluid, which inhibits the effectiveness of the Marlex Mesh. He believed that Dr. Pailet's attempted hernia repair in 1989 was a failure, and that plaintiff did not receive the best care. Dr. Swanson reiterated that he believed someone trained merely in OB/GYN surgery does not have the expertise to repair a ventral hernia.
Dr. Improta stated that he was board certified in both general surgery and plastic/reconstructive surgery. He first saw plaintiff on July 2, 1992 on Dr. Swanson's referral. Dr. Swanson had referred plaintiff because of her reports of painful intercourse and "an extremely large defect in the abdominal wall." Dr. Improta called the defect "bizarre." He felt it involved the abdominal wall support, fascia, and muscles. Dr. Improta explained that the name "ventral hernia" means that the hernia has resulted specifically from past surgery. He strongly disagreed with an opinion Mrs. Seagers had received from another plastic surgeon who opined the problem was cosmetic in nature. Dr. Improta said he'd never seen an OB/GYN repair ventral hernias, and definitely not with a synthetic material like mesh, which falls in to a specialized field.
The surgery, which occurred on July 16, 1992, was a joint effort with Dr. Swanson. The hernia was located from the pubic bone almost to the navel. Dr. Improta opened the abdomen, allowing Dr. Swanson to perform the hysterectomy. Dr. Swanson found the uterus itself to be in good shape, but strongly adhered to the interior of the abdomen. He found a loop of bowel to be sutured to the uterus.
Dr. Improta felt that Dr. Pailet's operative notes from 1989 to be deficient and lacking in appropriate information. Dr. Improta could not determine exactly what Dr. Pailet had done in his 1989 surgery; among other things, he could not determine the type of suture used in the mesh (because no sutures were present), nor how it was tacked down. He specifically stated that using absorbable sutures with mesh is a breach of the standard of care. Dr. Improta felt that thorough operative dictation was very important, especially if further surgery was indicated, so that the next surgeon would know exactly what had been done at the previous surgery. Drs. Improta and Swanson felt they operated in 1992 without this benefit.
Regarding the surgery itself, Dr. Improta said the rectus fascia looked normal, away from the Marlex Mesh. The old mesh was approximately 10 cm × 12 cm, with no visible sutures. All the surrounding tissues were lax. The abdominal muscles were of normal size and thickness, were greatly separated, but were not abnormal. Because of the redundancy of scarring and mesh, he removed about half of the old mesh, scar tissue, and *711 what was left of the anterior rectus sheath. Dr. Improta prepared an illustrative diagram, which is attached as Appendix "A". Dr. Improta believed that it was very important to close the peritoneum after abdominal surgery, something Dr. Pailet disagreed with in deposition. Dr. Improta was able to locate intact fascia not too far away from the Marlex Mesh. Post-operatively, he used a drain, because of undermining so much of the tissue, and because of the mesh. Dr. Improta explained that the mesh is dipped in antibiotics which causes a local tissue burn and blister-effect accumulation of fluid. The drain is used to remove excess fluid so that the fat can adhere to the mesh. He noted that Dr. Pailet's operative notes were silent about a drain, and believed that the failure to use a drain with the mesh is a further breach of the standard of care.
Post-operatively, Mrs. Seagers progressed well and healed nicely. She was required to wear a support garment or binder twelve weeks post operatively, a standard prescription for this type of hernia size. Dr. Pailet had not required any support garment after the 1989 attempted hernia repair, which Dr. Improta said accounted for one reason the operation was not successful, because the entire abdomen needs support during the healing process.
Finally, Dr. Improta opined that the failure of Dr. Pailet to receive specific informed consent regarding the use of the mesh was a breach of the standard of care, because the introduction of a synthetic substance like Marlex Mesh entertains specific special risks besides other normal operative risks.
The jury was presented with Dr. Pailet's testimony on one hand, and the testimony of Drs. Improta and Swanson on the other. During the trial, Dr. Pailet often testified inconsistently with his prior deposition testimony, and the issue of his poor record keeping was thoroughly explored. We believe the record contains ample evidence that Dr. Pailet breached the standard of care in both the 1987 C-section and the 1989 attempted hernia repair. Therefore, we will not disturb this finding.
Next, the defendant contends that the trial court erred in not qualifying him as an expert in general surgery. (The defendant was qualified as an expert in obstetric/gynecology only).
The trial court has great discretion in deciding which witnesses are qualified as experts. Armstrong v. Lorino, 580 So.2d 528 (La.App. 4th Cir.1991), writ denied, 584 So.2d 1166 (La.1991). It is the physician's knowledge of the requisite subject matter, rather than the specialty within which the specialist practices, that determines whether the specialist may testify as to the degree of care which should be exercised. Mitchell v. Kedia, 94-89 (La.App. 5th Cir. 10/12/94), 645 So.2d 730; Turner v. Massiah, supra.
Dr. Pailet testified that he had performed a one year residency in 1951-52 in general surgery, and had held a general surgery post in military service during the Korean War. However, since that time his practice was limited to OB/GYN, and the only surgeries he had performed since the 1950s were limited to those surgeries that presented themselves in his OB/GYN practice. Considering this information elicited at Dr. Pailet's voir dire, we see no abuse of discretion in the trial court's refusal to qualify the defendant as an expert in general surgery.
The defendant next asserts that the trial court erred in not finding Mrs. Seagers 100% at fault. However, defendant's only argument in this regard contends that Mrs. Seagers suffered known complications of surgery and that she was responsible for massive delays in seeking medical attention and that her problems were caused by previous surgeries. The record has already established that Dr. Pailet breached the standard of care in 1987 by misplacing plaintiff's bladder, which Drs. Improta and Swanson felt led to many of Mrs. Seagers' symptoms and problems. The record also establishes that Dr. Pailet's attempted hernia repair in 1989 failed because he was not qualified to repair a hernia that size, and misused the Marlex Mesh. The plaintiff testified that she had had none of the medical problems prior to the 1987 C-section, and this testimony was uncontradicted. There is no support for defendant's contention that the plaintiff caused her damages, or that they were caused by a *712 previous procedure not performed by Dr. Pailet. Regarding delay in seeking care, we discuss that contention infra with plaintiff's second assignment of error.
The defendant claims that the trial court erred in amending the jury verdict to award plaintiff the stipulated amount of medical expenses. The amount the jury awarded plaintiff was approximately 10% of the stipulated amounts of medical expenses, despite the fact that the jury found defendant 78% at fault.
A JNOV should be granted only when evidence points so strongly and overwhelmingly in favor of the moving party that reasonable minds could not reach different conclusions. LSA-C.C.P. art. 1811; Hardin v. Munchies Food Store, 521 So.2d 1200 (La. App. 2d Cir.1988), writ denied, 523 So.2d 1321 (La.1988). When a judgment reformed by an additur or remittitur is challenged on appeal, appellate review is limited to the reformed judgment. Hardin, supra, 521 So.2d at 1202.
We do not see an abuse of discretion in the partial grant of plaintiff's motion for JNOV raising the award of stipulated medical expenses to reflect the stipulated amounts. See Pearce v. Baltazar, 529 So.2d 1291 (La. App. 5th Cir.1988), writ denied, 533 So.2d 359 (La.1988).
Both the plaintiff and the defendant appeal the awards of general damages, plaintiff contending the awards were woefully inadequate, the defendant arguing the awards' excessiveness. Dr. Pailet, however, did not brief this assignment of error, and therefore we may consider it abandoned. Bordelon v. Cochrane, 533 So.2d 82 (La.App. 3rd Cir. 1988), writ denied, 536 So.2d 1255 (La.1989). Therefore, we will consider plaintiffs' arguments that three of the damage awards were abusively low: the award of past physical pain and suffering, $54,179.08; past, present and future mental anguish and emotional distress, $53,750.00; and the award to David Seagers for loss of consortium of $21,250.08.
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.E.D.2d 379 (1994). In determining damages for pain and suffering, the courts should focus on the duration and severity of the pain. Buckbee v. Aweco, Inc., 626 So.2d 1191 (La.App. 3rd Cir.1993).
Mrs. Seagers testified that her problems began immediately after the C-section in 1987. She had abdominal pain, nausea, urinary incontinence, recurrent fever, and bladder infections. At her first attempt at intercourse with her husband, she urinated on him. At the second attempt, several weeks later, plaintiff felt enough pain to make her sick to her stomach. Both plaintiffs testified that thereafter sexual intercourse was virtually nonexistent in their relationship until after the 1992 surgery in California.
Jody testified that the pain, hernia, and incontinence interfered with all her daily activities, including house work, child care, and her job. She testified that she had to wear "adult diapers" daily from the C-section in 1987 until the July 1992 corrective surgery in California, when her bladder was replaced correctly.
Both David and Jody testified about an incident wherein he had confided the couple's sexual problems to a co-worker, who believed the situation to be funny and who placed prank phone calls to Jody at home. Jody testified that it upset her so much that she left the home temporarily. David had to persuade her to return. Jody believed for many months after this that David was having an affair, and said it was a long time before she trusted him. That this incident affected plaintiffs deeply was apparent even from a cold transcript.
Upon reviewing the awards to plaintiff Mrs. Seagers, we agree that the jury abused its discretion in awarding damages. We believe that the record supports the raising of *713 the past physical pain and suffering award to $75,000.00, and we also raise the mental anguish and emotional distress award to $75,000.00. See Kelly v. Riverside Medical Center, 499 So.2d 1135 (La.App. 1st Cir.1986); Lucas v. St. Frances Cabrini Hospital, 562 So.2d 999 (La.App. 3rd Cir.1990); and Riser v. American Medical International, Inc., 620 So.2d 372 (La.App. 5th Cir.1993).
On David Seagers' claim for loss of consortium, both he and his wife testified that sexual intercourse was virtually nonexistent between them after the 1987 C-section and the 1992 corrective surgery. (The couple had only been married approximately four months at the time of the 1987 C-section). Additionally, the emotional relationship became very strained between them. David testified that he became afraid to touch his wife, fearing that he was in some way "doing something wrong" and causing her physical pain. And finally, Jody's incapacity caused David to assume most of the burdens of child care and housework, after he had already worked 12-15 hour days at Houston's. These problems lasted the entire five years.
A claim for loss of consortium encompasses seven elements, which include: 1) the loss of love and affection; 2) the loss of society and companionship; 3) the impairment of sexual relations; 4) the loss of performance of material services; 5) loss of financial support; 6) loss of aid and assistance, and 7) loss of fidelity. To be compensable, it is not necessary that a loss of consortium claim include damages from each category. Beckham v. St. Paul Fire & Marine Ins., 614 So.2d 760 (La.App. 2nd Cir.1993).
The jury found no fault on the part of David Seagers and awarded him $21,250.08 for five years' worth of loss of consortium with his wife. We believe that the jury abused its discretion, especially considering the the record's showing that the first six elements of a consortium claim were almost fully met. We therefore raise this award to $75,000.00. See Beckham, supra; Bolton v. Nagalla, 609 So.2d 1134 (La.App. 2nd Cir. 1992).
Plaintiffs assign as error the jury's determination that Jody Seagers was 22% at fault for failure to mitigate her damages. After close consideration of the record and testimony, we agree that the jury erred in this respect, and find Jody free from fault.
Jody testified that she experienced the above detailed problems immediately after the 1987 C-section. However, she trusted Dr. Pailet when he told her that the problems were temporary and would resolve themselves in time. She continued to believe in him, and scheduled the surgery in 1989 because Dr. Pailet said he would fix things by taking out the scar tissue from the C-section. Jody testified that it was only after the 1989 corrective surgery failed that she stopped trusting Dr. Pailet. She sought the opinions of four other doctors in the New Orleans area. Jody testified that each gave her vague answers about her condition, and at least one doctor was reluctant to be involved, having gone to school with Dr. Pailet. Jody said that it was only after they were transferred to Atlanta in 1991 that she got answers from doctors about her abdomen.
Both plaintiffs confirmed that they were still in debt to each of their parents, having borrowed money for both the C-section and the 1989 surgery. Jody admitted that in 1990 her insurer had approved payment for a hysterectomy, but would not pay for the abdominal repair, as it was considered cosmetic. The plaintiffs said that the insurer required $3500.00 in cash up front before surgery, and that they couldn't afford it, nor could they borrow any more money from their parents. Plaintiffs even looked into having the surgery at a charity hospital, but were told they did not qualify.
Upon moving to Atlanta in 1990, Jody found doctors who agreed that her abdomen repair was not cosmetic, and surgery was scheduled; however, plaintiffs were transferred to Los Angeles three weeks before the surgery. Upon moving to California, Jody soon found Drs. Swanson and Improta; the surgery was approved by their insurer, and took place five months after the Seagers's move to Los Angeles.
Louisiana jurisprudence states that a plaintiff is under a duty to minimize *714 his damages by submitting to reasonable corrective surgery necessary to eliminate any permanent disability. Horton v. McCrary, 620 So.2d 918 (La.App. 3rd Cir.1993). However, Louisiana law is clear that the burden is on the defendant to show that the plaintiff has not reasonably mitigated his damages, and the rule of mitigation of damages should be applied with extreme caution. Horton, supra, at 933.
Failure to undergo corrective surgery because the plaintiff cannot monetarily afford to do so is not failure to mitigate damages. Kuck v. City of New Orleans, 531 So.2d 1142 (La.App. 4th Cir.1988).
All three doctors testified that there was no medical reason for three years to elapse between the second and third surgeries. However, the plaintiffs had very real economic restraints, and we also find that the two moves in such a short time caused Jody's delay in getting the corrective surgery. Nowhere is there evidence in the record that the plaintiff in any way delayed trying to have her problems diagnosed and corrected. We believe the record shows that had it not been for the insurance company's initial failure to cover the procedure and the two relocations, plaintiff would have had the corrective surgery sooner than 1992. As it appears, Jody had the surgery as soon as she could reasonably have been expected to. Therefore, we reverse the jury's finding that Jody Seagers was 22% at fault, and reduce this percentage to zero.
Finally, plaintiffs ask that defendant be sanctioned for the pursuit of a frivolous appeal.
Pursuant to LSA-C.C.P. art. 2164, an appellate court may award damages for a frivolous appeal. However, as we stated in Davis v. Davis, 606 So.2d 575, 577 (La.App. 5th Cir.1992), "such damages are awarded... only when it clearly appears that the appeal was taken solely for the purpose of delay or that counsel for appellant does not seriously believe in his legal position." (citations omitted). After a thorough review of the record, we do not find that either of these criteria exists. Accordingly, we deny plaintiffs' request for damages.
Moreover, appeals are favored in the law. Gulf States Utilities Co. v. Dixie Electric Membership Corp., 248 La. 458, 179 So.2d 637 (1965) on remand, 185 So.2d 313 (La.1966).
Accordingly, the trial court's judgment is affirmed, except for that portion finding fault on the part of plaintiff Jody Seagers, which is reduced to zero. The general damages to Mrs. Seagers are raised as indicated above, as is the award to Mr. Seagers for loss of consortium. All costs of this appeal are assessed to the defendant-appellant.
AMENDED AND, AS AMENDED, AFFIRMED.
*715 
NOTES
[1] $75,000 + $75,000.00 + $10,166.67 (lost wages) + $28,620.77 (past medicals)